UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, WISCONSIN, the Commonwealth of MASSACHUSETTS, VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel*., KATHLEEN GRATTON and RAYMOND HIPPOLYTE | § § § § § § § § § § § § § § § § § § | Civil Action No. 17-791 |
| Plaintiffs, | § § § | |
| v. | § § | |
| PRECISION MEDICINE GROUP, INC., PRECISION FOR MEDICINE HOLDINGS, INC., PRECISION EFFECT, INC. f/k/a LEHMAN MILLET HOLDINGS, INC. f/k/a HEALTHSTAR EDUCATIONAL SYSTEMS, INC., d/b/a PRACTICE THERAPEUTICS. | § § § § § § § | |
| Defendants. | | |

**AMENDED COMPLAINT**

Relators Kathleen Gratton and Raymond Hippolyte (the "Relators"), bring this action on behalf of the United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government") under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States against defendants Precision Medicine Group, Inc., Precision for Medicine Holdings, Inc., Precision Effect, Inc. f/k/a Lehman Millet Holdings, Inc. f/k/a HealthSTAR Educational Systems, Inc., d/b/a Practice Therapeutics (collectively "Practice Therapeutics" or "PT" or "Defendants") to recover all damages, penalties, and other remedies provided by the False Claims Act, and analogous state statutes,[1] and for their complaint ("Complaint") allege:

---

[1]     Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.;* Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

1.     Based on the Relators' personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute" or "AKS"), and the false claims acts of the respective Plaintiff States, by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

2.     This case is wide-ranging, but Defendants' scheme is straightforward at its core. Starting no later than 2007, to increase sales for Novo, Defendants concocted and executed a white-coat marketing scheme that illegally used certified diabetes educators ("CDEs") as *de facto* Novo sales representatives and to induce primary care providers ("PCPs") to prescribe Novo's diabetes medications and devices.

3.     Certain portions of this case, along with others, were previously settled and have been dismissed as to former defendant Novo Nordisk, Inc. ("Novo").

## PARTIES AND RELEVANT NON-PARTIES

4.     Kathleen Gratton, "Relator 1" is a registered nurse ("RN") and CDE.  Relator 1 was employed by PT from early 2007 until late 2010.  During her employment, Relator 1 served as a CDE for Novo's Changing Life With Diabetes program ("CLWD").  Relator 1 was later promoted to Regional Manager ("RM") for the Southern Region.

5.     Raymond Hippolyte, "Relator 2" is a CDE and was employed by Novo from 2001 until mid-2014.  Relator 2 was initially hired by Novo as a sales representative, but was later promoted to CDE manager for Novo's New York Metro District.

6.     Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the

Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare").

7.      The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia.  They each bring claims for Defendants' violations of their respective state false claims acts, as set forth in detail in the Counts below.

8.      Novo is an international pharmaceutical company with headquarters in Denmark. In the United States, Novo has more than 5,000 employees and regularly does business, markets and sells its products in this district.  Novo manufactures, among other things, medications to treat patients with diabetes, including NovoLog, Levemire, and Victoza (the "Covered Drugs").

9.      NovoLog is a fast-acting mealtime insulin approved by the Food and Drug Administration ("FDA") for release in the U.S. in 2000.  In or around 2008, Novo (through PT) began producing and marketing NovoFine and NovoTwist, both of which are NovoLog "pen" delivery systems.  In January 2010, promotion began on NovoLog with a FlexPen delivery system.

10.     Levemir is a long-acting insulin which was approved by the FDA in the U.S. in 2005.

11.     Victoza is an injectable non-insulin medication, specifically a GLP-1 medication used to lower blood sugar, and was approved in the U.S. in 2010.

12.     The Covered Drugs are central to Novo's success in the pharmaceutical marketplace.  In 2013, alone, sales of the Covered Drugs topped $6 billion in the U.S., representing

over 10% of Novo's worldwide sales for the year.  And, although Novo's NovoLog products currently generate a majority of the Covered Drugs sales, the Company has dedicated enormous resources to promoting all of the Covered Drugs including its crown jewel, Victoza.  A significant portion of this funding, however, was allocated to Novo's scheme to increase market share of the Covered Drugs through the prohibited practices described herein.

13.     Novo is a member of The Pharmaceutical Research and Manufacturers of America (PhRMA) which is a trade group representing companies in the pharmaceutical industry in the United States and contains a code of conduct ("PhRMA Code").  Section 11 of the PhRMA Code deals with "Educational Items," and states:

> It is appropriate for companies, where permitted by law, to offer items designed primarily for the education of patients or healthcare professionals if the items are not of substantial value ($100 or less) and do not have value to healthcare professionals outside of his or her professional responsibilities . . . Items designed primarily for the education of patients or healthcare professionals should not be offered on more than an occasional basis, even if each individual item is appropriate.

14.     Moreover, Section 13 PhRMA Code covers "Independence and Decision Making," and states:

> No grants, scholarships, subsidies, support, consulting contracts, or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products. Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices.

15.     Defendants Precision Medicine Group, Inc., Precision for Medicine Holdings, Inc., Precision Effect, Inc. f/k/a Lehman Millet Holdings, Inc. f/k/a HealthSTAR Educational Systems, Inc., d/b/a Practice Therapeutics are among the largest global marketing services for health care services.  Defendants provided CDEs for the CLWD program.  According to PT, it provided "Clinical educator teams providing disease-state and product education (in physician practices)

that leads to improved clinical outcomes . . . . HealthSTAR CES partners with pharmaceutical sponsors to provide high-quality, distinctive education in physician practices that drives behavior change."

## JURISDICTION AND VENUE

16.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

17.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq*., and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

18.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the District of Columbia.  Relators have already served the Government with a statement of all material evidence and information currently in their possession and of which they are the original source. These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims.  Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

# LEGAL BACKGROUND

## *The False Claims Act*

19.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

> (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

    (1) the terms "knowing" and "knowingly"—

        (A) mean that a person, with respect to information—

            (i) has actual knowledge of the information;

            (ii) acts in deliberate ignorance of the truth or falsity of the information; or

            (iii) acts in reckless disregard of the truth or falsity of the information; and

        (B) require no proof of specific intent to defraud;

    (2) the term "claim"—

        (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

            (i) is presented to an officer, employee, or agent of the United States; or

            (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

                (I) provides or has provided any portion of the money or property requested or demanded; or

                (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

        (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

    (3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

20.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

*The Anti-Kickback Statute*

21.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(A) and (B), prohibits offering to pay or paying any remuneration (including any kickback, bribe, or rebate) to any person to induce such person "to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program" or "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.* Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid. In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

22.     For purposes of the AKS, "remuneration" includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. Importantly, the statute has been interpreted to cover *any arrangement where one purpose of the remuneration is to obtain money for referral of services or to induce further referrals. United States v. Kats*, 871 F. 2d 105 (9th

9

Cir. 1989); *United States v. Greber*, 760 F. 2d 68 (3rd Cir. 1985), *cert. denied*, 476 U.S. 988 (1985).

23.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7b.

24.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA").

25.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA.  42 U.S.C. § 1320a-7b(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."  Public Law No. 111-148, § 6402(h).

26.     Compliance with the Anti-Kickback Statute is a condition of payment under federal health care programs.  Therefore, any violation of the Anti-Kickback Statute is a violation of the

False Claims Act because claims seeking payment for services or prescriptions tainted by kickbacks are either "factually false" or "legally false," and therefore do not meet the conditions of payment from federal health care programs.

27.     Defendants violated the AKS in two ways.  First, Defendants illegally solicited and received remuneration from Novo to induce PCPs to prescribe Novo's products and devices.  And, second, Defendants violated the AKS by providing CDEs and valuable services to PCPs in exchange for, and with the intent of inducing, millions of dollars' worth of prescriptions for Novo's drugs and devices.

28.     Regarding the first aspect of Defendants' fraud, from 2007 through 2010, pursuant to a contractual relationship between the Defendants and Novo, Novo implemented a marketing scheme directed at potential prescribers of its diabetes products.  For purposes of the AKS, two fundamental questions must be addressed regarding Novo and Defendants' relationship:

1) Is there remuneration between parties?

2) If so, is any part of the remuneration to induce referrals and/or for making recommendations for items paid for by federal healthcare programs?

29.     Here, Defendants and Novo had a contractual arrangement whereby Novo paid (*i.e.*, remunerated) Defendants for its services.  Therefore, for purposes of analyzing the marketing scheme under the AKS, the element of remuneration is established.

30.     Just as indisputable is whether "*any*" part of Defendants' contractual remuneration from Novo was to "induce" either "referrals" and/or make "recommendations," thus implicating the Anti-Kickback Statute and subjecting Novo and Defendants' marketing scheme to scrutiny. Pursuant to that contract, as discussed in more detail below, Defendants hired and deployed over 50 expert diabetes clinicians to market, promote and recommend Novo's diabetes pharmaceuticals products. Although these diabetes clinicians were all employees of PT, they were all trained and

directed by Novo's marketing management to promote and recommend Novo's products.

31.     As is detailed below, one of Novo's purposes in contracting and paying Defendants to give free diabetes educational service to PCPs – regardless of whether Novo had any intent to cause that service to educate patients or physicians – was to induce those physicians to prescribe Novo's diabetes products.  This necessarily violates the AKS.

32.     The Anti-Kickback Statute provides for certain safe harbors.  The personal services and management contracts safe harbor to the Anti-Kickback Statute ("personal services safe harbor") protects many marketing activities by health care providers and suppliers from liability under the Anti-Kickback Statute.  *See* 56 Fed. Reg. 35952, 35974 (July 28, 1991) ("many advertising and marketing activities warrant safe harbor protection under the personal services and management contracts safe harbor.").  Pursuant to the personal services safe harbor, remuneration does not include "any payment made by a principal to an agent as compensation for the services of the agent" as long as the following requirements are met:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d).

33.     The agreement between Novo and Defendants does not fit under the AKS's personal services exception for several reasons.

34.     First, the AKS' personal services exception does not apply if the "services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law."  42 C.F.R. § 1001.952(d)(6). As discussed in more detail, below, the contract between Novo and Defendants was to provide CDEs to physician practices to induce referrals of Novo's diabetes medications.  Due to the fact that Defendants' provision of CDEs constitutes remuneration to induce referrals in violation of the AKS, the services performed under the agreement "involve the counselling or promotion of a business arrangement or other activity that violates" the AKS.[2]  In addition, Defendants' CDEs

---

[2]     Defendants provision of CDEs violates the Office of the Inspector General's ("OIG") position on "Product Support Services" as set forth in its Compliance Program Guidance for Pharmaceutical Manufacturers ("CPG").  68 Fed. Reg. 23,731 (May 5, 2003).  CPG Section, II B (2), "Relationships with Physicians and Other Persons and Entities in a Position to Make or Influence Referral," states:

   …. *Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine* whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer. Moreover, under the

were provided with Novo marketing materials that were not FDA-approved.  Thus, this business

arrangement violates FDA regulations prohibiting such conduct.  Therefore, the personal services

exception to the AKS is not applicable to Defendants' agreement with Novo.

     35.    Second, Defendants have also failed to satisfy the safe harbor provision requiring

that the "agency agreement covers all of the services the agent provides to the principal for the

term of the agreement and specifies the services to be provided by the agent."  *Id.* at (d)(2).

Defendants failed to satisfy this requirement because, while the contractual agreement among

---

anti-kickback statute, neither a legitimate purpose for an arrangement (e.g., physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (i.e., the purposeful inducement of business)….

Similarly, the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals ("PhRMA Code") specifically prohibits such product support services in Section 13,  Independence and Decision Making, stating:

No … subsidies, support, … or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products. Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices.

Here, Defendants engaged in precisely the type of conduct that OIG warned against – and conduct which would give rise to AKS liability if other elements are found.  When viewed through the lens of the OIG and the PhRMA Code it is clear that Novo's services 1) provided "valuable tangible benefit to the physician with the intent to induce or reward referrals"; 2) "eliminate[d] an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)"; and, 3) in the words of the PhRMA code section 13, were support services provide to PCPs "in exchange for prescribing products or for a commitment to continue prescribing products…"

Specifically, in exchange for prescribing Novo products, Defendants offered PCPs: (i) the services and resources of a CDE, including teaching office staff about diabetes, patient management and standards of care;  (ii) programs designed to increase profitability by reducing patients' A1Cs, referred to as "Office Educational Sessions"; (iii) CDE/patient educational encounters that can be billable events for the practice, known as "Patient Education Sessions"; and (iv) CDE Novo "Device Training," designed to save staff time and/or office resources that would have otherwise been allocated to such activities.

Defendants and Novo required PT's CDEs to provide educational services in connection with the CLWD program (and as discussed in more detail below), Defendants' CDEs were actually providing sales and marketing services.   Therefore, Defendants cannot avail themselves of the personal services safe harbor.

36.   Indeed, for years, OIG has been suspicious of utilizing "independent" sales agents for government reimbursed healthcare items and/or services stating:

> Sales agents are in the business of recommending or arranging for the purchase of the items or services they offer for sale on behalf of their principals, typically manufacturers, or other sellers (collectively, "Sellers"). Accordingly, any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute, irrespective of the methodology used to compensate the agent. Moreover, because such agents are independent contractors, they are less accountable to the Seller than an employee. *See* 56 Fed. Reg. 35952, 35981 (July 29, 1991); 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989).

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

37.   And OIG is especially wary of arrangements with independent sales agents that involve "white coat" marketing.   White coat marketing is where medical suppliers use medical professionals to promote its products.   OIG's concern is that patients may not be able to differentiate between the professional's medical advice and their promotion of medical products. Specifically, OIG has stated:

> The fraud and abuse risks are compounded where, as here, a physician or other health care professional is involved in the marketing activity—a practice sometimes referred to as "white coat" marketing. White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services—especially when marketing to their patients. *See, e.g.*, 56 Fed. Reg. 35952, 35974 (July 29, 1991). Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch.

OIG Advisory Opinion 11-08 (June 14, 2011).

38.     In this case, Defendants have used and are using CDEs – medical professionals – to promote Novo's products to physicians and patients.  And Defendants do this under the guise of providing physician practices and patients with "education."

39.     OIG has, in several advisory opinions, provided a non-exhaustive list of six suspect characteristics of arrangements among sellers, sales agents, and purchasers that appear to be associated with an increased potential for program abuse.  They are as follows:

1)  Compensation based on percentage of sale;

2)  Direct billing of federal health care program by the seller for the item or service sold by the sales agent;

3)  Direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a federal health care program;

4)  Direct contact between the sales agent and federal health care program beneficiaries;

5)  Use of sales agents who are healthcare professionals who are persons in a similar position to exert undue influence on purchasers or patients; and

6)  Marketing items or services that are separately reimbursable by a federal healthcare program (e.g., items or services not bundled with other items or services exclusively by a DRG payment), whether on the basis of charges or costs.

OIG Advisory Opinion 98-10 (Aug. 31, 1998).

40.     In discussing these factors, OIG, in Advisory Opinion 98-10, specifically stated "[t]he more factors that are present, the greater the scrutiny we ordinarily will give an arrangement."  OIG has continued to cite these same six illustrative factors in analyzing arrangements between providers and independent sales agents.  *See* OIG Advisory Opinion 99-3 (Mar. 16, 1999).

41.     In this matter, the conduct of Defendants' independent sales agents (*i.e.,* PT CDEs)

met each of the suspect characteristics above:

1) PT employee's incentive compensation and performance evaluations was directly linked to the sales volume created by PT's recommendation of Novo and "points" that the CDEs earned by engaging PCPs and patients in "teachable moments" and "device training";

2) Novo's diabetes products were billed to federal health care programs; [3]

3) PT CDEs were in direct contact with hundreds of thousands of physicians and staff in a position to prescribe Novo products, which were reimbursed by federal healthcare programs;

4) PT expert diabetes clinicians were in direct contact with patients who were federal health care program beneficiaries;

5) PT expert diabetes clinicians were healthcare professionals able to, and who did in fact, exert undue influence on purchasers or patients; and

6) Novo's diabetes pharmaceuticals are separately reimbursable by a federal healthcare program.

42.     Beyond the unlawful remuneration paid to Defendants by Novo detailed above, since 2007 through the present, Defendants gave prescribers unlawful inducements to prescribe Novo drugs to patients.  These inducements were provided by Defendants and Novo.  However, starting in 2011, Novo brought this scheme "in house" and continued to directly offer free services to PCPs in exchange for these physician's prescribing Novo's products.

43.     The remuneration had a specific purpose.  Novo knew that if it could create unique economic "value proposition" to potential prescribing providers, it could not only gain better access to them but, more importantly, could secure prescriptions.  Thus, unlike the direct *quid pro quo* cash for prescriptions, sham speaker programs and other well- known kickback schemes,

---

[3]     Although Defendants did not themselves submit claims for diabetes drugs to federal and state health insurance programs, they knew and intended for their marketing practices to cause the submission of thousands of claims to these health programs for prescriptions that were not eligible for program reimbursement.

Defendants offered to and did in fact provide free diabetes education, trained clinicians and expertise to physicians (*i.e.,* in kind remuneration) in order to induce referrals from physicians to whom this free diabetes expertise was provided.  As shown, below, this conduct violates the AKS.

## FACTUAL BACKGROUND

### I.    Overview of Medicare And Its Benefits

44.    Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

45.    Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled.  42 U.S.C. § 1395w-101 *et seq*.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.  HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

46.    Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse.  42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(3)(v).

47.    The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)).  42 U.S.C. § 1395w-115(a).  Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs.  42

U.S.C. § 1395w-115.

48.     For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")).  Those sums include:

    a) a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

    b) a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

    c) thereafter a 25% copay on all costs up to the coverage gap, 42 U.S.C. § 1395w-102(b)(2);

    d) 100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. § 1395w-102(b)(3) & (4)  (the "coverage gap" or "donut hole"); and

    e) whereafter, the beneficiary enters the catastrophic coverage phase and only pays a copay of 5%, or $2 for a generic drug and $5 for any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

49.     Because beneficiaries are required to pay a significant copay, and 100% of the cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare Part D provides certain protections to beneficiaries.  For example, sponsors must make the negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an enrollee is in (*i.e.* deductible, ordinary coverage, coverage gap or catastrophic coverage).  In addition, that negotiated price must also remain uniform within a particular pharmacy regardless of what phase of the program the beneficiary is in.  Prescription Drug Benefit Manual, Ch. 5 "Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in").

50.     Another beneficiary protection is that, while they are in the deductible or coverage

gap phases where they pay 100% of the costs, beneficiaries may avail themselves of a cash price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price or other discount for all customers, or if the beneficiary is using a discount card." Prescription Drug Benefit Manual, Ch. 14 "Coordination of Benefits," at 50.4.2.  If the beneficiary makes such a purchase outside of their plan, their expenditure will still count toward their TrOOP if they report it to their plan.  *Id.*

51.     For Part D Plan sponsors, the program is a quasi-free market model that uses a variety of incentives which are part of the structure of the program.  The starting point is that the program only pays the sponsor "interim payments . . . based on the Secretary's best estimate of amounts that will be payable after obtaining all of the information." 42 U.S.C. § 1395w-115(d)(1).  In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program. *Id.*; *see* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42 U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

52.     In simplest terms, the sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries.  The government then makes "interim payments" to the sponsor on a monthly basis.  As an express condition of receiving those interim payments, the sponsor is required to submit to the government truthful and complete data, including actual cost, for every prescription filled.  At the end of each year the government then compares its interim payments to the actual cost data, and determines whether the sponsor owes a refund to the government, or whether the government is required to pay more money in order to meet its subsidy target.  In order to further incentivize the sponsor to keep costs down, however,

the refund or additional payment is first subject to risk corridors which penalize the sponsor if actual costs exceed its bid, and reward the sponsor if actual costs are below its bid. 42 U.S.C. § 1395w-115(e). As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the government for each prescription.

53.     Medicare Part B also covers some diabetes services. Specifically, Medicare Part B covers diabetes self-management training. 42 C.F.R. § 410.141. Diabetes self-management training helps patients with diabetes learn to successfully manage their disorder. This includes information on self-care and lifestyle changes. Medicare beneficiaries are eligible for diabetes self-management training if, in the past twelve months, the patient:

    1)  was diagnosed with diabetes;

    2)  was changed from taking no diabetes medication to taking diabetes medication, or from oral diabetes medication to insulin;

    3)  was previously diagnosed with diabetes and recently became eligible for Medicare; or

    4)  is at risk for complications from diabetes.

54.     The training must be ordered by the patient's physician as part of a patient's plan of care. Further, the training must be performed by a certified diabetes self-management education program. These programs are certified by the American Diabetes Association or Indian Health Service.

55.     In addition, Medicare Part B also covers medical nutrition therapy services for beneficiaries with diabetes or renal disease. 42 C.F.R. § 410.132. To be eligible under Part B, the nutrition therapy services must be ordered by a physician and performed by a registered dietitian or certain other nutrition professionals.

## II.     Overview of Medicaid And Its Benefits

56.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

57.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS.  42 U.S.C. § 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ."  *See* 42. U.S.C. § 1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

58.     The Medicaid programs of all states reimburse for prescription drugs.  The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter.  The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment.  After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis

22

for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures).  42 C.F.R. § 430.30.

### III.   The TRICARE Program

59.     TRICARE, formerly known as Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), is a managed health care program established by the United States Department of Defense.  10 U.S.C. §§ 1071-1110.  TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.  TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by the Defendants.

### IV.   The United States Food, Drug, and Cosmetic Act

60.     The FDA regulates the manufacture, sale, and distribution of drugs and devices in the United States under the authority of the United States Food, Drug and Cosmetic Act ("FDCA"). The FDCA establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States. This authority includes oversight of promotional labeling and advertising for prescription drugs and restricted devices.  21 U.S.C. § 502.

61.     The FDCA defines "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article . . . ."  21 U.S.C. § 321(k).  "Labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m).  For a prescription drug or device to comply with the act's requirement of adequate directions for use, its labeling must contain, among other things, information addressing product hazards and other risk information, as specified in FDA regulations. 21 C.F.R. §§ 201.100(d)(1) & (3) and 801.109(d).

62.     The FDCA also subjects advertising for prescription drugs and restricted devices to the disclosure of risk and other informational requirements.  Advertisements for prescription drugs must include, among other things, "information in brief summary relating to side effects, contraindications, and effectiveness," as specified in FDA regulations.  21 U.S.C. § 352(n). Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications . . . ."  21 U.S.C. § 352(r).  Both prescription drug and restricted device advertisements also must not be false or misleading.  21 U.S.C. § 352(q)(1) & 321(n); 21 C.F.R. § 202.1(e)(5).

63.     Disease awareness communications are communications disseminated to consumers or health care practitioners that discuss a particular disease or health condition, but do not mention any specific drug or device or make any representation or suggestion concerning a particular drug or device.  FDA Guidance for Industry (draft guidance), *"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).[4] Help-seeking communications are disease awareness communications directed at consumers.  *Id.*

64.     Help seeking and disease awareness communications constitutes neither labeling nor advertising.  *Id.*   Therefore, help seeking and disease awareness communications are not subject to the disclosure of risk information and other requirements for labeling and advertisement communications under the act. *Id.*

65.     The FDA will treat as a disease awareness communications any communications by or on behalf of a manufacturer, distributor, or retailer of a drug or device that:

---

[4]     On May 6, 2015, the FDA announced that it was withdrawing the draft guidance.  *See* 80 Fed. Reg. 26059.  Thus, pharmaceutical manufacturers can now rely on two previously released industry policy guidance releases: Clarification of Policy on Institutional, Corporate, or Health Message Advertising (September 1985) and Institutional/Disease-oriented Advertisements (June 3, 1988).

    i.      discuss a disease or health condition;

    ii.     if consumer-directed, advise the audience to "see your doctor" for possible diagnosis and/or treatment;

    iii.   if aimed at health care practitioners, encourage awareness of signs of the particular disease or health condition, or otherwise provide information to assist in the diagnosis of the particular disease or health condition;

    iv.   do not mention a particular drug or device; and

    v.    do not include any representation or suggestion relating to a particular drug or device.

*Id.*

66.    When a disease awareness communication is presented in combination with a product promotion communication, in a way that causes the audience to perceive the two pieces as an advertisement or promotional labeling piece, a disease awareness communication may be treated by the FDA as labeling or advertising.  *Id.*  For example, a purported disease awareness communication disseminated by or on behalf of a drug manufacturer can be subject to the FDA's labeling or advertising requirements if it mentions a specific drug or contains a representation or suggestion concerning a specific drug or device. *Id.*

67.    In determining whether a disease awareness communication and promotional communication were disseminated in such a way as to trigger the FDA's advertising or labeling requirements, the FDA focuses on how the audience is likely to perceive the communication. Specifically, the FDA has stated that:

> a supposed disease awareness communication could be properly treated as advertising or promotional labeling if presented in combination with a product claim advertisement or promotional labeling piece in a manner that causes the pieces' messages to be linked together by the audience. In such a case, the combined communication would also communicate a particular product's indication and efficacy for a certain medical condition. If the combined communication does not comply with the act and FDA's advertising or labeling

regulations, the communication would cause the promoted product to be misbranded.

*Id. See also* Enforcement Letter From FDA's Division of Drug Marketing, Advertising, and Communications to Schering Corp. (Aug. 18, 2000) (finding that two advertisements, a help seeking advertisement and a reminder advertisement, which immediately followed each other in a magazine, converted the entire presentation into one full product advertisement, subject to the FDA's regulations)[5]; FDA Guidance for Industry, *Distributing Scientific and Medical Publications on Unapproved New Uses – Recommended Practices* (February 2014) (Stating that scientific or medical journal articles and reference texts and clinical practice guidelines ("CPG") provided by pharmaceutical manufacturers to health care professionals should be distributed "separately from the delivery of information that is promotional in nature. For example, if a sales representative delivers a CPG to a physician in his or her office, the CPG should not be attached to any promotional material the sales representative uses or delivers during the office visit. To the extent that the recipients of the CPG have questions, the sales representative should refer the questions to a medical/scientific officer or department, *and the officer or department to which the referral is made should be independent of the sales and/or marketing departments*.") (emphasis added).

68.     Moreover, the FDA has identified two factors which it examines when determining whether two communications together qualify as promotional labeling or advertising.  The two factors are: (1) Are the pieces perceptually distinct in use of graphic, visual, thematic, or other presentation elements?; and (2) Are the pieces presented in close physical or temporal proximity?

---

[5]     This letter is available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM166052.pdf.

FDA Guidance for Industry (draft guidance), *"Help-Seeking" and Other Disease Awareness Communications by or on Behalf of Drug and Device Firms* (January 2004).

69.     Of these two factors, the FDA considers the determinant factor to be whether the pieces are perceptually distinct.    In addressing this factor, the FDA recommended that manufacturers:

> ensure that their disease awareness communications and reminder promotional pieces or product claim promotional pieces are sufficiently distinctive in terms of their thematic, graphic, visual and other presentation elements so that they will not be perceived as a single promotional piece that includes both a product name and a use, and is thus subject to the requirements for "labeling" or "advertising" mandated by the act and regulations.

*Id.*

70.     Here, Defendants violated the FDA's for rules for labeling, advertising, and sales representative communications by simultaneously providing purported disease awareness communications and drug-specific promotional communications.   This is due to, and evidenced by, in large part, to the close collaboration between Defendants' CDEs and Novo sales representatives.

71.     First, the educational materials CDEs were given to provide to physicians and their staff were promotional in nature.   According to Relator 1, the educational materials associated with the CLWD program did not mention Novo's products, specifically, but did discuss types of insulin that Novo sells and were branded with Novo's logo.

72.     Moreover, in their oral communications with physicians and their staffs, CDEs were only to discuss Novo's medications if the conversation went in that direction.   However, an essential and intended component of this "education," was to steer the conversation to a discussion of Novo's products, and then promote these medications to the physician and staff.   Simply put, even though the communications made by Defendants' CDEs did contain an educational

component, they were promotional communications because, not only did the CDEs reference Novo's diabetes medications, they also directly recommended the Novo's products to health care professionals and patients.  And although CDEs were not given promotional materials for specific drugs, they were provided with the package inserts for Novo's diabetes medications, which they were instructed to leave behind at physician practices.  Further, physicians, their staff, and patients were all aware that the CDE was there to promote Novo's drugs, and therefore it is impossible to disassociate a CDE's communications regarding diabetic medications, generally, and Novo's diabetic medications.  Indeed, this can be nothing other than promotion of Novo's medications.

73.     The collaboration between Defendants' CDEs and Novo's sales representatives make clear that the CDE's communications were promotional in nature, regardless of whether or not the promotional materials and CDE communications, in isolation, constituted disease awareness or promotional communications.  According to Relator 1, and as discussed in more detail below, the scheme was to pair a sales representative with a CDE on their visits to physician practices.  According to Relator 1, the sales representatives were permitted to discuss Novo's medications "at any time" (*i.e.* they did not have to wait until the conversation was steered in that direction).  Therefore, as CDEs and sales representatives called on physicians together, it was easy for the sales representative to inject themselves into the conversation between the CDE and physician to start a discussion of Novo's products and medications.  For example, if a CDE was explaining to a physician the benefits of Basal insulin, as well as providing educational materials addressing the same, the sales representative could insert themselves into the conversation to promote Levemire, Novo's Basal insulin product.

74.     As demonstrated above, Defendants and Novo sought to bypass the FDA's rules regarding promotional materials and sales representative's communications by sending both CDEs

and sales representatives to call on physicians.  Even assuming that the CDEs' communications and educational materials were not promotional in nature, when these communications are disseminated in conjunction with communications from a Novo sales representative, the educational communications are transformed into promotional communications.  Indeed, it would be unreasonable to suggest that Defendants could circumvent the rules regulating pharmaceutical sales representatives and drug promotion by simply sending two representatives together to a physician's office, and labeling one of them as an "educator."

75.     Lastly, the CLWD program, itself, violates the FDA's rules and regulations.  In an FDA policy guidance release entitled "Institutional/Disease-oriented Advertisements" the FDA stated "We will not permit the use of wording which ties the non-product message to a program which results in a patient getting the prescription drug of the sponsoring firm and only that drug. We will view such an ad as a prescription drug ad."  FDA Policy Guidance, *Institutional/Disease-oriented Advertisements* (June 3, 1988).    As described herein, all of the non-product communications by Defendants' CDEs are tied to the CLWD program.  This program, by design, virtually ensures that enrolled patients are only prescribed Novo's diabetes medications.  Thus, Novo's CLWD program is the exact type of program the FDA warned about in its policy guidance.

## V.     **Defendants' Fraudulent Conduct**

### A.     **False Claims Act Violations**

76.     Defendants have, since at least January 2006, engaged in an unlawful marketing and kickback scheme with respect to its promotion of the drugs Novolog, Levemire and Victoza (the Covered Drugs) that was intended to, and did in fact, induce physicians to improperly prescribe these medications.  These prescriptions were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore were issued in violation of the Anti-

29

Kickback Statute and the FCA.  As a result of Defendants' misconduct, the Government has been defrauded and suffered a substantial loss.

77.     Diabetes is a chronic disease that affects the body's ability to regulate sugar levels in the blood.  Elevated blood sugar (hyperglycemia) can have long-term detrimental effects on the heart, blood vessels, eyes, kidneys, and nerves.

78.     According to a report compiled by data analytics firm GlobalData, the top ten diabetes drug manufacturers have generated a total of $62 billion in 2014 global sales, a rise of 5.1% year-on-year.  Given this huge market place, most of the major pharmaceutical companies have one or more diabetes medication, each competing against one another for market share. Among them, one pharmaceutical giant continues to lead in global sales: Novo Nordisk.

79.     Specifically, Defendants perpetrated an illegal marketing scheme, whereby it provides physicians practices with a "free" CDE in exchange for prescribing their patients Novo's products.  The CDEs were provided through Novo's CLWD program.  The value to a physician practice of having a CDE cannot be understated.  Among other things, PT CDEs provided: (a) free educational programs and materials that would otherwise have cost them thousands of dollars; (b) free patient education and seminars; (c) free, in-office training by well-trained clinicians – CDEs – who could interact on a near peer-to-peer level with physicians, nurses and staff; (d) free access to the latest research in diabetes management; (e) free "log books" (Novo branded, of course) to provide to patients which assists with diabetes management compliance; and, most importantly, (f) free unlimited access to dedicated "Go To" diabetes experts available to them and their patients at any time.  Significantly, Novo only provided these benefits to practices prescribing its products.

80.     Although the purported purpose of providing physician practices with CDEs was to educate patients and staff on diabetes care, this was merely pretense.  In reality, the CDEs were

nothing other than sales representatives disguised as clinicians (or working directly with sales representatives) to gain access to prescribing physicians.  Similarly, the CLWD program was simply a marketing program designed to provide physician practices with valuable resources in exchange for prescribing Novo's products to their patients.

81.     The unlawful marketing campaign was extremely successful.  These practices were widespread, egregious and orchestrated from the highest levels of Novo and Defendants.  To date, the marketing scheme detailed herein has resulted in Novo being the undisputed market leader in diabetes pharmaceutical sales with its Covered Drugs' revenue exceeding a staggering $25 billion over the last five years – a huge portion of which was paid for by Government healthcare programs. As such, the Defendants are liable under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the analogous laws of the Plaintiff States.

### 1.     The Covered Drugs

82.     The scheme, discussed herein, focused on securing sales for the Company's diabetes medications: NovoLog, Levemir, and Victoza.

83.     NovoLog is a fast-acting mealtime insulin which, in 2000, was approved by the FDA for release in the U.S.  In approximately 2008, Novo began producing and marketing NovoFine and NovoTwist, both NovoLog "pen" delivery systems.  In January 2010, promotion began on NovoLog with a FlexPen delivery system.

84.     Levemir is a long-acting insulin which, in 2005, was approved by the FDA for release in the U.S.

85.     Victoza is an injectable GLP-1, non-insulin, medication used to lower blood sugar, which was approved by the FDA in 2010.

86.     The Covered Drugs are vital to Novo's success.  For example, in 2013, sales of the Covered Drugs topped $6 billion in the U.S., representing over 10% of Novo's worldwide sales

for the year.  Currently, NovoLog products produce the most sales of all the Covered Drugs.
Tellingly, however, Novo's CEO has referred to Victoza as "the future" for the Company.  Given
Novo's optimistic outlook for Victoza, it comes as little surprise that Novo dedicated an enormous
amount of resources to promoting the Covered Drugs, with a focus on its crown jewel, Victoza.
Unfortunately, a large portion of this funding went into Novo and Defendants unlawful marketing
scheme to increase market share for the Covered Drugs.

### 2. Certified Diabetes Educators

87.     CDEs are health care professionals who possess training, knowledge and
experience in diabetes management, pre-diabetes care, and diabetes prevention.  CDEs must be
certified by the National Certification Board for Diabetes Educators ("NCBDE"), located in
Arlington Heights, Illinois.   CDE certification is "practice based" and requires health care
professionals to gain professional experience working in the field.  Only clinicians that meet the
NCBDE's discipline/licensure requirements (*e.g.*, registered nurse, clinical psychologist,
registered nurse, occupational therapist, optometrist, pharmacist, physical therapist, and/or
physician) are eligible to receive a CDE certification. Further, clinicians must have at least two
years of professional experience in their clinical field to be eligible for CDE certification. If a
health care professional meets the eligibility requirements, the clinician must pass a rigorous, four
hour examination administered by the NCBDE.  Certified CDEs are recognized as specialty
clinicians with particular training, education and experience in diabetes education and care.

88.     CDEs are particularly useful to primary care practices who treat diabetes patients.
For example, the American Association of Diabetes Educators ("AADE") stated:

> What can diabetes educators do for your practice?
>
> Diabetes educators have a unique skill set and can serve as critical support in
> primary care. Diabetes educators can: 1) Increase your practice's efficiency by

assuming time consuming patient training, counseling and follow-up duties. 2) Help you meet pay-for performance and quality improvement goals. 3) Track and monitor patients' care and progress and provide you with status reports. 4) Help you manage your patients' metabolic control, lipid levels and blood pressure through medication management and physician-directed protocols. 4) Help delay the onset of diabetes with prevention and self-management training for your patients who are at high risk.

89.     The NBCDE provides Canons of Ethical Conduct ("CEC") that all certified CDEs must follow.[6] Pertinent to this action, the CEC requires that "Professional affiliations, including employment and referral relationships, may not adversely limit access to services and shall not adversely affect the decision making process of the CDE."  CEC, § II, C2.1.

90.     The CEC also provides the following:

PREAMBLE C1.1

The Certified Diabetes Educator® ("CDE" ® ) assumes specific responsibilities to physicians or other licensed/registered health professionals, people with diabetes or prediabetes and their significant other(s), the public, associates, and to the Profession itself. These responsibilities must be discharged with honor and integrity to assure the maintenance of public confidence in the Profession and to protect the person with diabetes or prediabetes and his/her significant other[s] . . . . The Profession exists for the primary purpose of recognizing and advancing the specialty practice of diabetes self-management education (DSME) and support. CDEs are responsible for maintaining and promoting ethical practice, including, without limitation, reporting unethical practices in accordance with these Canons.

II.     RESPONSIBILITIES     TO     THE     PHYSICIAN     AND/OR APPROPRIATELY LICENSED/REGISTERED HEALTH CARE PROVIDER

C2.1 Provision of Services

The CDE shall recognize the person's freedom of choice in selection of diabetes treatment and education and his/her health care provider. Professional affiliations, including employment and referral relationships, may not adversely limit access to services and shall not adversely affect the decision-making process of the CDE. The CDE must adhere to the ethical principles of the Board which shall take preference over business relationships.

---

[6]     NBCDE, Canons of Ethical Conduct, *available at* http://www.ncbde.org/assets/ 1/7/coebooklet1112.pdf.

III. RESPONSIBILITIES TO THE PERSON WITH DIABETES/PREDIABETES

C3.1 Evaluation and Recommendation

It is the responsibility of the CDE to recommend diabetes self-management plans specific to the needs of the individual and to provide appropriate educational and learning information to the person with diabetes/prediabetes, other healthcare professionals, the public, etc. The CDE shall recognize that each individual person is unique and deserves specific and responsive guidance from the CDE. The CDE shall be guided at all times by concern for the physical, emotional, social and economic welfare of the person. The needs, goals and life experiences of the person shall be taken into account. All decisions by the CDE must be made with the understanding and intent that the individual person's best interests are the primary concern.

C3.4 Fees and Compensation

The CDE shall provide services based on the needs of the individual receiving the services and not solely for personal financial gain. The CDE shall not engage in false, misleading or deceptive actions in relation to the ultimate cost of the services undertaken or furnished. The CDE shall not over utilize or unnecessarily continue services beyond the point of benefit or by providing services more frequently than necessary. The CDE shall not submit false or misleading information in requesting payment or reimbursement.

C3.5 Practice Arrangements

The CDE shall not: (i) directly or indirectly request, receive or participate in dividing, transferring, assigning or rebating any funds derived from a referral of a patient to any other individual or entity, whether affiliated with the CDE or otherwise; or (ii) profit by means of a credit or other valuable consideration, such as an unearned commission, discount or gratuity for providing services, except for the fees earned for services performed for the patient.

The CDE shall refer all persons with diabetes/prediabetes to the most appropriate service provider, taking into consideration the nature and extent of the problem, treatment resources and availability of healthcare benefit coverage, and the likelihood of receiving appropriate and beneficial care. If the CDE is involved in an arrangement with a referring source in which the referring source derives income from the CDE's services, the CDE must disclose all pertinent information to the patient, including without limitation that the referring practitioner derives income from the provision of the services. The CDE shall advise his/her employer of any employer or employee practice which is in contradiction with this Canon C3.5.

### 3.        Novo's Changing Life With Diabetes Program

91.     On its face, the CLWD program was seemingly designed to promote diabetes awareness and help educate physicians, their staff and patients through education and empowerment.  In reality, the CLWD was little more than a disingenuous marketing scheme that violated the AKS.

92.     From 2007 up and until the present, Defendants, through the CLWD program have unlawfully induced prescribers by offering free training, expertise and services from a CDE in exchange for prescribing the Covered Drugs.  The plan was to use the "education program" to exponentially increase market share of its insulin products.  The diabetes education program accomplished this end in two ways.  First, the "free" services provided through the education program were specifically designed to, and indeed did, serve as an inducement to potential referral sources to prescribe the Covered Drugs.  Second, the CDEs were trained and functioned as sales representatives.  Through theses CDEs, Novo sales representatives gained access to diabetes medication prescribers by offering the "free" education to the providers.  By sending a clinician into a physician's practice who could assist its staff and patients deal with medical issues, the CDEs were able to build strong relationships with physician and practice staff.  These relationships resulted in unprecedented access to prescribing physicians.  Indeed, by sending clinicians into physician practices, who functioned like a sales representative, Defendants and Novo were able to gain access to physicians, which could be obtained by sales representatives.

93.     Just as important as the increased access to physicians, was the ability of Defendants CDEs to market Novo's medications directly to patients.  By using educators, who work directly with patients, Defendants were able to market Novo's drugs directly to patients, but because it classified its CDEs as educators, they did not mention any of the drug's side effects.

Moreover, Novo would permit PT CDEs to speak off label about using Victoza with insulin, which is not its clinical indication.  In addition, CDEs could counsel doctors and patients and "push back" on the FDA black box warning for Victoza.  For example, Victoza's FDA black box warning states that the drug:

> causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors (adenomas and/or carcinomas) at clinically relevant exposures in both genders of rats and mice [see Nonclinical Toxicology (13.1)].  Malignant thyroid C-cell carcinomas were detected in rats and mice.  It is unknown whether Victoza® will cause thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined.

94.     CDEs, for example, would describe the metabolic system of a laboratory rat to physicians, and then explain how it was substantially different from that of a human.  Therefore, according to the CDE, physicians should not be worried about the black box warning and prescribe their patients to Victoza.

95.     This conduct, if engaged in by a sales representative, would be highly illegal.  To circumvent liability, Novo and Defendants designated the CDEs as "educators" rather than sales representatives.  However, when the true facts regarding the CDEs conduct are examined, and the titles bestowed by Novo and Defendants are ignored, it is clear that the CDEs were in fact sales representatives.  Thus, this "form-over-substance" tactic of labeling CDEs as educators, when they were sales representatives by every measure except title, will not shield Defendants from liability.

### a.     The Agreement Between Novo and Defendants

96.     In or around late 2006, Novo entered into a contractual agreement Defendants, whereby Defendants' CDEs were to promote, recommend and market the Covered Drugs to potential prescribers, their staff and patients, under the guise of promoting the CLWD.  The precise contractual financial terms between Novo and Defendants are not known by Relator 1.  However,

according to Relator 1, after entering into the agreement, Novo became Defendants' largest client.

97.     Following the execution of the agreement, Defendants started recruiting a team of CDEs to promote the Covered Drugs, including nurses, dieticians and other clinicians.  Although Novo hired Defendants for the sole purpose of providing it with clinicians to market its products, it was directly involved in hiring process for CDEs.  As a result of inserting itself into the hiring process, Novo ensured that most of the CDEs hired were individuals that had prior relationships with Novo management (*e.g.*, had served as independent contractors for Novo in the past).  For CDE applicants lacking such relationships, Defendants would forward their resumes to the Novo manager responsible for managing the CDE, if hired.  Indeed, all applicants were required to receive the approval of their would-be Novo manager before Defendants would hire them.  This led Defendants to the initial hiring of approximately sixty CDEs (approximately 60% nurses, 40% dieticians) to promote Novo's products.

98.     At the outset, Defendants created four territories its CDEs would serve: West, Ohio Valley, South and Northeast.  PT then designated a regional manager ("RM") and assigned between ten to fifteen CDEs to each territory.  In late 2007, the marketing scheme was expanded throughout the continental U.S.   As the program expanded, Defendants continued to recruit, hire and deploy clinicians throughout the United States.

**b.     CDEs Were a Kickback to Induce Referrals**

99.     Defendants CDEs employed by PT/Novo in conjunction with the CLWD program were intended to induce referrals by offering physicians the value of having a CDE on site to assist the practice and its patients.  Specifically, through the CLWD program, physician practices were provided with: (a) free educational programs and materials that would otherwise have cost them thousands of dollars; (b) free patient education and seminars; (c) free, in-office training by well-

trained clinicians – CDEs – who could interact on a near peer-to-peer level with physicians, nurses and staff; (d) free access to the latest research in diabetes management; (e) free "log books" to give to patients which helped diabetes management compliance (Novo branded, of course); and, most importantly, (f) free unlimited access to dedicated "Go To" diabetes experts available to them and their patients at any time.  Significantly, Defendants only provided these benefits to practices prescribing its products, and focused on providing these benefits to those practices writing the most prescriptions for Novo's drugs.

100.    The initial training provided to physicians' practices lasted between three to four months.  After completing the initial training, the CDE would then visit the practice on a regular basis to provide follow up training, education, and other services, and, of course, to market Novo's products to the physician and staff.

101.    The level of services a practice received through the CWLD program was dependent upon the number of prescriptions it wrote for Novo's products.  In other words, the CWLD program was not administered the same for every practice that enrolled.  Rather, a practice would get more or less of the services provided through the CWLD program depending on the number of prescriptions it wrote for Novo's products.  So, for example, the more prescriptions a physician wrote for Novo's products, the more on-site time and access to the CDE the practice would receive.

102.    Further, Novo and Defendants identified an additional value proposition, which could be offered to physicians:  educating them how to increase revenue by improving patients' quality measures and assisting them achieve such results.  In January of 2006, CMS started the Physician Voluntary Reporting Program to collect performance measurement data in seven areas of clinical care.  Most providers did not participate as there was little or no financial incentive to

report.  That changed with the with passage of the Tax Relief and Health Care Act of 2006, which enabled CMS to reward physicians' reporting efforts under the Physician Quality Reporting System ("PQRS") (formerly known as Physician Quality Reporting System Initiative (PQRI)). This incentive program allowed providers to reap a potential incentive bonus equal to 1.5 percent their Medicare billings.  In 2006, some 86,000 qualifying providers received about $92 million, or almost $1,100 apiece, for their PQRS performance in 2008.  In 2009, 120,000 clinicians who reported to CMS under the PQRS received a total of $234 million in bonuses in 2010.  In 2010, CMS made $391 million in bonus payments with the average incentive being $2,157 per eligible professional.  And, in 2014, CMS started to assess penalties to providers who failed to report under the PQRS.

103.    In addition to the bonuses and penalties assessed by CMS, more and more commercial carriers also moved toward similar PQRS programs requiring providers to report clinical performance measures.   Since 2007, providers can increase revenue from these carriers by implementing PQRS measures.  These performance PQRS measures are directly related to diabetes care management in a primary care practice setting – the measures that have the greatest value to primary care providers who have diabetic patients.  These same providers were a target rich environment for Novo, who wanted to increase its market share of the Covered Drugs.

104.    Novo and Defendants taught its CDEs to understand the value to providers in diabetes measures, which could be used by the providers to increase revenue.  Moreover, Novo and Defendants provided the CDEs with marketing materials detailing how CDEs could help practices obtain higher reimbursements under PQRS.  Novo management stressed that the CDEs' sales pitch *must* focus on increasing the reimbursement rates for physicians.  Specifically, CDEs explained that, through PQRS, providers could receive incentive payments for lowering its patients

A1C levels and other diabetes metrics.  And the CDEs would further explain that they would assist the practice in lowering its patients A1C levels to receive the incentive payment.  Novo and Defendants helped select and manage the patients that providers would submit to CMS in order to qualify for higher reimbursements.   This PQRS expertise had a clear and direct economic value – there is an entire industry of consultants in healthcare who are paid to train providers in PQRS bonuses.  This expertise was provided for free when tied to increases in sales of Novo's products, however.

106.    The CDEs were also trained to, and did, in fact, assist physicians in obtaining higher reimbursement under PQRS for metrics unrelated to diabetes.

106.    The CDEs also provided physician practices' staff (*e.g.*, medical assistants) with certifications to demonstrate expertise in the use of Novo's products.  This practice benefitted the physician's staff, the practice, and Novo.  The practice benefitted because they could now tout that its staff were more qualified than the staff at competing practices.  For staff members, the certification provided them with extra credentials to bolster their resumes in case they ever wanted to switch jobs.  And for Defendants, by providing these certifications, they secured more clinicians who were able promote and demonstrate Novo's products to their patients.  Except for here, Novo did not have to pay them.

### 4.    The CDEs Were Sales Representatives

107.    Defendants' CDEs Novo used in conjunction with its CLWD program were actually sales representatives.  This is demonstrated (and described in more detail, below) by the way the CDEs were trained, managed, and compensated.

108.    Novo and Defendants could not simply offer providers a *quid pro quo* – education and training in exchange for prescriptions – without running afoul of state and federal regulations

prohibiting such conduct.  Indeed, Novo and Defendants knew that these CDEs could not openly appear to act in the role of sales representatives because they were offering training and education, and such conduct violates the AKS as pharmaceutical companies are prohibited, pursuant to the PhRMA Code, from providing educational services or items with a value in excess of $100. Further, by characterizing the CDEs as pharmaceutical sales representatives, their ability to market and promote Novo's products would have been limited by FDA regulations, especially in regard to the material and information that can be used to market its medications.  The FDA regulates the types of information pharmaceutical companies can use to inform physicians and patients about new mediations.  As the CDEs could not directly market Novo's drugs without openly violating FDA regulations, Novo created a contrived role for the CDEs – one that would make them appear distinct and independent from the role of true pharmaceutical sales representatives – as educators.

109.    As the market for diabetes medications has rapidly increased over the years, pharmaceutical companies have expended significant resources in an attempt to gain market share in this booming marketplace.  Novo and Defendants quickly realized that the best way to secure prescriptions, and, therefore, establish market share, was to employ sales representatives who could easily get an audience, and develop a relationship of trust, with prescribing physicians.  With this concept in mind, Novo created the CLWD.

110.    The CLWD accomplished both of these objectives.  First, by offering CDE services to physician practices, physicians would more easily agree to meet with a representative.  This is because of the value CDEs provide to physician practices.  Novo and Defendants naturally realized that, by offering the free services of a CDE, physicians would be significantly more likely to meet with a representative.  Their refusal would result in missing the opportunity to have a CDE assist their practice, free of charge.

111.    Second, CDEs are much better positioned to establish a relationship of trust with physicians than typical sales representatives.  CDEs, as clinicians, are relied upon for their medical acumen.  Thus, CDEs are in the position to advise physicians on the best plan to treat their patients, and, therefore, build a level of trust that a sales representative would be unable to establish.  Moreover, CDEs are clinicians, unlike typical sales representatives, and, therefore, are more likely to be viewed as peers by physicians.  This bond further allowed the CDEs to foster relationships with physicians that a typical sales representative would be unable to develop.

112.    But merely gaining access and building relationships with physicians through educators would not accomplish Novo and Defendants' goal: gain market share for the Covered Drugs.  This, however, required physicians to prescribe its medications to their patients.   To accomplish this, they needed sales representatives, not educators.  Thus, Novo and PT decided to train the CDE team to function as sales representatives in every aspect, except title.  By doing this, they were able to gain access and build trust with physicians while, at the same time, promoting its products.

### a.    Training the Sales Team

113.    The training provided to the CDE team was focused on marketing and selling Novo's products.

114.    Despite Defendants' claims that the CLWD's purported purpose was to educate physicians, their staff, and patients, the training received by the CDEs suggests the contrary.  Rather than train PT's CDEs on how best to provide diabetes education, the training provided focused primarily on sales and marketing tactics.  And the only training, which could, ostensibly, be considered for educational purposes was instructions on how to educate staff and patients on Novo's products.

115.    After Defendants assembled the marketing team, the CDEs were required to complete a comprehensive training program.  Tellingly, the training was directed by Novo's Sales and Marketing division in conjunction with Defendants' management.  Needless to say, the training focused on sales and marketing, not education.  The training, which was conducted between February 12, 2007 and March 2, 2007, consisted of two parts: a week-long "Home Study" program and a "Live In-House Training" program, conducted in Princeton, NJ.  The Home Study program ran from February 12-18, 2007, and the Live In-House Training program ran from February 18, 2007 through March 2, 2007.

116.    The at-home training was broken down into modules over the course of the week. The specific modules are as follows:

Tuesday, February 13th, 2007.  Novo Nordisk Training Modules – Levemir/Self-Tests.

- Module 1 – Product Insert
- Module 2 – Clinical Studies
- Module 3 – Pivotal Studies
- Module 4 – Physician Mindset
- Module 5 – Competition
- Module 6 – Handling Objections

117.    Initially, the training focused on the Covered Drugs pharmacology and other issues regarding Novo's diabetes products, much of which the CDEs already knew given their own extensive training.  However, the at-home training quickly transitioned into the best ways to market and sell Novo's products.  Indeed, the training provided to the CDE team was almost identical to what would be expected during training for sales representatives at any major pharmaceutical manufacturer.  For example, during the five day at-home study, the CDEs learned about "cold calling" on providers, overcoming objections from providers, sales call and route planning, and strategies for gaining access to physicians' offices.

118.    On the last point, strategies for gaining access to physicians' offices, Novo provided

Relator 1 (and other CDEs) with a script to introduce physicians to the program and gain access to their offices.  Relator 1 recalls that the CDE script stated, in part, the following:

> The goal of Changing Life with Diabetes is to provide the education and tools that Health Care Providers like yourself need to ultimately defeat diabetes . . . .

> The Changing Life with Diabetes program includes a Diabetes toolkit for your practice.  This valuable resource contains patient education materials, a step by step flashcard guide to injecting insulin, a simple guide for checking blood glucose, a list of local resources including diabetes organizations and support groups, and more . . . .

> I will work together closely with you and your staff to individualize the best possible implementation strategy for your practice based on your individual needs and practice dynamics.  When your practice completes the *Changing Life with Diabetes* program you will receive a recognition document from Novo Nordisk that will communicate your commitment to enhanced knowledge in diabetes care to your patients and your community . . . .

> Together we can make a positive impact on the alarming trend we are witnessing with the increasing incidence of diabetes.  Can I get your commitment today to participate in this program so we can work together to implement the *Changing Life with Diabetes* program in your practice?  I would be happy to go over the practice agreement with you today so that we can get started right away.  I can then schedule the first educational session with your staff.

119.    After completing the at-home training, Relator 1 and her PT colleges attended the live training in Princeton, NJ, called "NovoNordisk/Practice Therapeutics Live In-House Training."  This training program consisted of ten days of classroom lectures and practical workshop modules.

120.    According to Relator 1, the live training focused primarily on marketing and sales techniques.   Indeed, most of the training was provided by Novo marketing and sales representatives, and mainly consisted of role play exercises focused on marketing Novo's products to physicians.  According to Relator 1, many CDEs had trouble with the sales and marketing aspects of the training, as they had little business acumen and were unfamiliar with the sales, marketing, and promotion of pharmaceuticals.  In fact, several CDEs were discouraged about the

marketing responsibilities placed on clinicians purportedly hired to serve as educators.

121.    During the live training, CDEs were taught to market Novo's products by, among other things, speaking about the virtues of Novo's products using Novo branded and unbranded materials.[7]  Relator 1 and her colleagues were taught to state "we" (*i.e.*, Novo) "have products that can address your patients' health needs" and ask if the physician was interested in learning more about those products.  Importantly, Defendants' CDEs were taught to never recommend any other competitors' products – irrespective of whether it had a medical benefit to a patient.

122.    Another point of emphasis was the CDEs' collaboration with Novo sales representatives.  CDEs were taught how to encourage physicians to have a meeting with a Novo sales representative in that territory that could then directly promote, sell and market Novo's product line to physicians.  Once the CDEs began developing relationships with their Novo sales representative counterparts, they began to not only recommend the Novo representative to PCP targets, they also began to directly recommend Novo's products to PCP targets and patients.  This conduct is in violation of Section 13 PhRMA Code of Interactions.

123.    Relator 1's training was followed by additional training from September 10 to 13, 2007 at a Sales Meeting in Orlando, Florida.  Relator 1 has her notes from this training which demonstrate the extent to which PT's CDEs were to be acting as *de facto* Novo sales agents.  For example, Workshop Break-Out Session No. 1 – "Setting the stage for practice behavior change" contains the following role-play section:

CDE:   "…what has been your experience with Basal insulin?"

---

[7]      FDA regulations govern the marketing of pharmaceuticals by sales representatives. Accordingly, all materials utilized in the marketing must be approved by the FDA.  The sales representative's conduct is limited to these FDA approved branded materials.   Here, the CDE's were using the pretense of selling an "education" program – not Novo's drugs.  Thus, by engaging in such conduct, Novo permitted CDEs to speak beyond the contents of any FDA approved materials.

MD:     "I haven't prescribed much Basal."

CDE:    "Levemir is a newer Basal insulin with less hypoglycemic effect.  It can be administered simply by insulin pen once or twice daily."

124.    The role-play then promotes the Novo's flex pen which dispensed Basal insulin.

125.    Novo senior management was fully aware and on board with PT's marketing efforts. In an email dated August 28, 2007, regarding a regional meeting, PT Regional Manager Robin Freeburg ("Ms. Freeburg") states: "I heard terrific feedback on the team's progress last night at a dinner from both [Novo] Pam Harris and Greg Reilly."

### b.  CDEs Were *De Facto* Sales Representatives

126.    As already noted, Defendants' CDE teams were sales representatives disguised as clinicians.  Consistent with the sales and marketing training discussed, above, every interaction a CDE had with a physician was carefully scripted to produce the desired result: more prescriptions for Novo products.  Indeed, Relator 1 realized during her training that Novo's CLWD program was not intended to "educate," but instead to gain access to and offer providers the services of CDEs in exchange for referrals.  As detailed below, the day-to-day activities and processes for CDEs is almost identical to that of sales representatives in the pharmaceutical industry.

127.    For example, using IMS Health prescription data ("IMS data"), Novo and Defendants would identify and target potentially high prescribing primary care physician and/or primary care practices.  These physicians and/or practices were designated internally by Novo as "Gold," "Silver" or "Bronze" targets ("PCP targets").  Gold level targets were the highest potential prescriber; Silver being the next tier; and Bronze the least likely to prescribe.  Most, if not all, of these targets were prescribing insulin products and were determined to have the highest potential for prescription increase.  CDE teams were permitted to call on "non" PCP targets, however, this

practice was discouraged by PT and/or Novo management – unless Novo prescriptions could likely be obtained.

128.    And it was not enough for CDEs to simply call on these physicians, but Defendants also made them responsible for increasing practices' volume for diabetes prescriptions.    For example, providers designated as "Bronze" would be managed, worked, and marketed so that their prescription volume increased to become a "Silver" target, and eventually a "Gold" target.    And CDEs were extremely successful, and indeed almost alchemist-like, in creating Gold out of Bronze.    In fact, a comparison of Novo's internal Excel spreadsheets containing PCPs' target designations should reveal that a significant number of Bronze level physicians were eventually converted to Gold.    It was in this way that Defendants and Novo began to build, create, and dominate market share for its diabetes medication.    As Novo noted, its prescription sales were rising in direct correlations with Defendants' efforts.    In fact, during a March 8, 2010 conference call with the South team, an agenda item notes:

> "NNI - 2.8 ROI" (i.e. return of investment).    Further, it notes "market dynamics - model drives ROI" and "Net revenue 078.2, 089.4, 0922.8 ($114 percent increase)."

129.    Relator 1 states that, regarding the above-mentioned notes, "return of investment" and "net revenue" refer to Novo's sales of diabetes drugs, as it relates to Novo's expenditure in implementing the CLWD program.    After all, Novo was not generating any revenue directly from the CLWD program that was, of course, provided for "free."    Relator 1 also recalls being shown slides containing the sales data for Levemir and NovoLog at regional and national sales meetings.    Indeed, Novo speakers universally applauded Defendants' efforts in increasing sales volume.

130.    Once armed with the PCP targets, Novo's plan was multi-directional.    For prescribers who did not have a relationship with Novo, Defendants' CDEs would offer free diabetes education, training and expertise as a means of getting Novo's sales representatives "in

the door" of these providers to sell the Company's products.  If Novo had established a relationship with the PCP target, Novo's sales representatives would offer the free services of the Defendants' CDEs to drive a PCP target to Novo's products and to increase volume.  There was reciprocity in the relationship between Novo and the PCP target: the more prescriptions the physician wrote for Novo's diabetes medications, the more CDE services would be provided to the PCP target.  For example, more prescriptions meant more CDE "on site" time at the provider's office (for educating, device demonstrations, *etc*.) or greater access to educational materials and other valuable resources.  Importantly, Novo's sales representatives would not offer PT's CDEs to a provider was not a regular prescriber or who was believed would have a low probability of prescribing.

131.    At the day-to-day level, the plan worked as follows: Novo would provide Defendants' management with an Excel file that contained the IMS data, and Defendants' management would then share the data with its CDEs.  Relator 1 and her fellow CDEs would then begin to make unsolicited "cold calls" to these targeted providers and offer to provide them with a comprehensive diabetes education program.  This program would be advertised as "free" of charge to the physicians.  Relator 1 and her fellow CDEs were trained to use a sales call note portal system called the Patient Education Tracking System ("PETS") to meticulously record each encounter with a target physician.  The PETS data and notes were then shared with Novo's sales representatives to apprise them of which physicians CDE teams had a relationship with and how much they could expect sales volume to increase from a particular physician.

132.    Interactions between Novo sales representatives and Defendants' CDEs were not limited to the aforementioned examples.  Rather, CDEs and sales representatives work hand-in-hand with each other to secure as many prescriptions as possible.  Consistent with this plan, PT

management repeatedly emphasized to Relator 1 and the other CDEs that they needed to collaborate and coordinate their physician calls, routing and sales plans with their assigned Novo sales representatives.  To that end, during the February 2007 training in Princeton, NJ, Relator 1 and her PT colleagues were provided with contact information for the Novo sales representative assigned to their territory.  Relator 1 and her CDE team were instructed to work closely with the Novo sales representatives in their territory.  Specifically, CDEs were instructed to "team up" and identify targets that could potentially generate prescriptions for Novo's diabetes products.

133.    In carrying out these directives, CDEs were required to coordinate their in-person office calls with their Novo sales representative counterparts. In fact, it was a common and preferred practice for both Novo's pharmaceutical sales representatives and PT's CDEs to jointly detail and pitch a target PCP, their staff and even patients.   Relator 1 has this instruction documented in her call notes.  This raises a key question: if the CWLD CDEs only goal was to educate, then why would coordination with a Novo's sales representative be necessary or even encouraged?  The obvious answer is because the CWLD program was designed specifically to increase prescription volume, not provide education.  There are hundreds and hundreds of PETS and EOM notes that demonstrate this collaboration between PT's CDEs and Novo's sales representatives.  For example, each PT CDE's EOM contained section entitled "Success Stories," which detailed a vignette of a "success."  Some examples include:

> SEPTEMBER 2009 – Employee DG: "Durham . . . Two physicians attended the 2nd session and 3 physicians attended the 3rd session, which has allowed the DCS to speak with these previously 'no-see' physicians . . . . Durham - Physician in a 'no-see' practice listened in as a very educated patient asked CDE questions about the different treatment options for his uncontrolled diabetes.  Physician stepped out into the hall with CDE and asked several more questions, and then decided to start the patient on the Levemir flex pen."

> SEPTEMBER 2009 – Employee KT: "After teachable moments initiated in one rural SC territory, the evaluation stated, 'The doctors and nurses are very glad to

have you as a resource and you have very quickly established credibility, trust and rapport with the entire office.  This has already improved our business with several new Levemir starts and offices that continue to request additional visits.'"

134.    Even more significant is the fact that CDEs and sales representatives were required to coordinate and jointly attend "lunch and learns" ("L&Ls"), a common practice in the pharmaceutical industry where a sales representative will bring food, snacks and/or, coffee – usually in a lunch setting – to the physician's office to market and promote their company's products.  Further, it was a regular and accepted practice for Novo sales representatives to request that PT's CDEs "pay for the lunch" because the sales representative had already used up their own L&L budget.  This practice, in addition to demonstrating that Novo itself considered PT's CDEs to be sales representatives, allowed the Company's sales representatives to increase the amount they could spend on PCPs in the promotion of Novo products.

135.    L&Ls are a quintessential sales technique used by sales representatives in the pharmaceutical industry.  Thus, the fact that CDEs were allocated funds, for the sole purpose of conducting L&Ls, in itself, demonstrates that Novo considered Defendants' CDEs to be *de facto* sales representatives.

136.    PT had meticulous reporting requirements for its CDEs.  Indeed, CDEs were required to input each and every encounter with a PCP target on the PETS system.  Further, each CDE had to compile an "End of Month" report ("EOM") and submit it to their regional manager.  Then, Novo's sales managers would review IMS Health prescription data and compare it with PT CDEs' PETS notes and EOM reports.  Relator 1 would also meet with her Novo district and regional sales manager counterparts and participate in PT's regional manager sales calls.  During these calls, Novo's IMS prescription data was shared and targeting discussed.  The data was shared verbally in the coordination meeting and electronically on some occasions.  This same information

was also regularly provided to PT's CDEs. A few examples from the EOM make this clear. For

example:

> August 2009 - Employee KT: CDE is tracking individual MD market share change in insulin on a quarterly basis in all active accounts to assess ROI. One Gold MD has increased Basal share >20% in Novo Nordisk's favor.

> August 2009 – Employee DG: "CDE attended lunch with DCS in an office where DCS had already planned to do an in-service on flex pens. Working together, the CDE and DCS were able to leverage this opportunity into having all four physicians sign up for more comprehensive diabetes education for the staff through the changing life with diabetes program. The physicians in this office have not been using much of Novo's insulin, so hopefully this will create some dialog in this office."

> AUGUST 2009 – Employee KT: "Territory best practice success stories . . . CDE's relationship with the clinical staff as a result of doing TM's and sharing information on the standards of diabetes care in Seneca, SC office has resulted in the following comment from Chris Wilson, DCS.": "Kim, this is outstanding. You have created more business in there than I have in three years. Thank you so much. Chris."

> SEPTEMBER 2009 – Employee KT: "[Novo] and [PT] support for the CLWD program in Greenville and Ashville Districts continues to escalate as market share for NNI product line increases for participating offices. However, this fosters an environment in these practices, which makes it difficult to convert from TM's to DA's in order to move on to new practices."

> December 2009 – Employee JW: Success Stories - Atlanta North . . . "DCS emailed CDE a list of the top 20 prescribers of GLP-1."

> October 2009 – Employee JW: Territory Best Practices – "Shared POA three target list with DCS team indicating physician signed up for the CLWD since 2007 highlighted. Request DCS to review list and collaborate with CDE which of the practices that are highlighted could benefit from TM and to inform CDE of any physicians not highlighted who would be good targets for CLWD to impact business."

137.    It was in this way, with Novo sales representatives and PT CDEs working in

coordination, that Novo was able to immediately and effectively capture market share for the

Covered Drugs. Novo and PT coined a term for this process: "pull through," meaning that the

CDEs would make the recommendation and Novo's sales representatives would "pull through"

the sale.  The success of the Novo's pull through strategy was extraordinary.  For example, in the United States, Victoza sales went from less than $1 million to greater than $270 million.  Indeed, this success was built on the recommendations of PT CDEs in violation of the AKS.

138.    Consistent with the training, PT, through its CDEs, directly promoted and marketed Novo's NovoLog and Levemir products from 2007 until late 2009.  PT would initially market the "Free" CLWD program to the PCP targets, and then, once the CDEs gained access to the PCP targets' offices, they would begin to promote and market Novo, Novo sales representatives, and eventually NovoLog and Levemir.  As already referenced, Novo provided PT's CDEs with voluminous branded material to help promote its products to PCPs. Those materials included:

| Materials approved in PCP | MD | Staff | Patient | Leave Behind |
|---|---|---|---|---|
| Detail Aid (131601R1) | x | x | | Yes |
| Tool kit (large) | x | x | | Yes |
| TOIGC (136798 ringed detail piece) | x | x | | No - education purpose only |
| Mini tool kit (139191-A) | x | x | | Yes - limited # can be ordered/year |
| Carb Counting Booklet | x | x | x | Yes |
| Caring for Your Diabetes Booklet (135626) | x | x | x | Yes |
| Diabetes and You Booklet | x | x | x | Yes |
| Diabetes Medicine Booklet | x | x | x | Yes |
| Your Guide to Better Office Visits Booklet | x | x | x | Yes |
| Checking your blood glucose Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Foot Care for People with Diabetes Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Gestational diabetes Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| How to inject insulin Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Hypo and hyperglycemia Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Leg exercises Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Type 2 diabetes and Insulin Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| What is diabetes Fact Sheet | x | x | x | Only original in the tool kit/no copies |
| Backgrounder (131641R2) | x | x | | Yes |
| | | | | |
| Flex pen test medium demo pen | x | x | | No - training only |
| Flex pen starter kit (133794A) | x | x | | Yes |
| Flex pen education station(136921) | x | x | | Yes |
| Dosing Guide for Patients with T2 Diabetes ( Moving toward Levemir(138260A) | x | x | x | Yes |
| Victoza test medium demo pens | x | x | | No- training only |
| Getting started with Victoza pen (140087) | x | x | | Yes |
| Injectable  cube (139674) | x | x | x | Yes (NOTE:  Approved for pen demo only with patients in TMs) |
| Incretin DVD | x | x | | Yes (NOTE:  Only 10 available to CDE) |
| Unbranded GLP 1 flashcard (140243) | x | x | | No - education purpose only |
| Unbranded flashcard- Targeting GLP 1 in a logical approach to treating Type 2 diabetes | x | x | | No - education purpose only |
| Injectable in the treatment of T2 diabetes ( video) | x | x | | Yes |
| Diabetes Flow sheet (131858R1) | x | x | | yes |
| Portion Plate | x | x | | Yes - 1 only for practice/as demo |
| Novo Log tear pad(132865) | | | x | Yes-only Flex pen demo  TMs |
| Novo Log 70/30 tear pad (132866) | | | x | Yes- only Flex pen demo TMs |
| Levemir tear pad (132864) | | | x | Yes- only Flex pen demo TMs |
| Continue on the path of success/ managing A1C ( large poster -136711) | x | | | Yes |
| Continue on the path of success brochureb (136711) | x | x | x | Yes |
| Levemir PI* (130958) | x | x | | No - reference only |
| Victoza PI* | x | x | | No - reference only |
| Novo Log PI* | x | x | | No - reference only |
| Novo Log 70/31 PI* | x | x | | No - reference only |
| Tools to manage your diabetes ( includes monofilament ) (138092) | x | x | x | Yes |
| CLWD PPT ( in PETS) | x | x | | No- education purpose only |
| Therapeutic Options PPT ( in PETS) | x | x | | No- education purpose only |
| | | | | |
| Myth/Fact Tear Pad  (132255) | x | x | | Yes |
| Levemir Dosing Wheel  (138260AR1) | x | x | | Yes |

139.    In the early stages of the CWLD program, Novo raised questions about PT's CDEs talking "on brand," meaning discussing Novo's products, specifically.  According to Relator 1, Defendants were concerned that specifically discussing Novo's products would be improper because CDEs were supposed to exhibit independent clinical judgment.  However, as time passed, this guideline became increasingly difficult to follow, due to management's instructions and training directing them to do the contrary, and eventually the guideline was wholly eliminated.

140.    Indeed, it became increasingly clear to Relator 1 and her colleagues that their job, in fact, was to be anything but independent.  Rather, their role was part of a coordinated effort to increase prescription volume.  For example, after a CDE gained access to a provider's office by offering their free expertise, services and education, the CDE would be armed with Novo branded materials which they could use to market, promote and sell Novo's product line.

141.    Due to the services CDEs provide to physician practices, Defendants were aware, and indeed intended, that its CDEs would constantly be put in a position to recommend and promote Novo's products under the guise of education.  For example, providers and/or their staff would regularly ask CDEs about different medications to treat diabetes.  Specifically, CDEs were routinely asked questions regarding: (a) medications available to treat its diabetic patients; (b) particular patient types, symptoms, co-morbidities and the like; (c) insulin, such as when to start, how to dose, what to take; and (d) types of delivery systems (*e.g.*, injectables, pens, *etc.*) that were available.

142.    Of course, whenever such questions were asked, PT's CDEs would always, without fail, recommend, and even demonstrate, a Novo product to the provider. Further, this allowed the CDE to transition their "educational" pitch from diabetes management, generally, to educating physicians and their staff on Novo's products, their indications, and management. After the

transition, this became the focus of the CDEs "education." The CDE would then recommend that the PCP speak with the Novo's sales representative, who would do any required "closing."

143.     As part of the messaging, Novo and PT emphasized "insulin sooner, insulin earlier." Novo instructed PT CDEs to push this message on every visit. While there may have been some clinical and health benefits to some patients starting insulin earlier, there was unequivocally an economic benefit to Novo. Specifically, once a patient began taking insulin for their diabetes, the patient would be on insulin for life. And, since PT's CDEs were recommending Novo's products, the result of this practice was obtaining a patient who would consistently generate revenue for Novo throughout the course of their life. Thus, unlike a sales representative, who could only suggest that a physician prescribe Novo's products to a patient already prescribed to insulin, the CDEs could recommend that the patient be prescribed to insulin, and that the physician should prescribe one of Novo's products to meet the patient's needs.

144.     Indeed, the compensation structure for CDEs demonstrates that the intent of the scheme was to use CDEs to promote Novo's drugs. According to Relator 1, CDEs received "points" for every "teachable moment" or "device training" they conducted, and the number of "points" that each CDE received was directly correlated to their bonus. "Teachable moments" and "device training," however, were not what they would seem from their names – they were really about increasing the sales of Novo's drugs.

145.     According to Relator 1, CDEs worked with three types of patients: (i) those who had a prescription for insulin, but not for Novo's drugs (approximately 40% patients seen by Relator 1); (ii) those who did not have a prescription for insulin (approximately 30% of patients seen by Relator 1); and (iii) those who had a prescription for Novo's drugs (like the FlexPen, for example) and had filled that prescription and wanted to learn to use it. Of these categories, the

most relevant to this matter are those in the first two categories.

146.    With respect to the first category, Relator 1 was instructed to meet with PCPs and to inform them that she would like to meet with these patients to help them with anything they needed that was diabetes related and to teach them how to use their medications to control their diabetes and generate positive outcomes.  When Relator 1 met with these patients (rarely with a staff member from the PCP present) she would utilize Novo branded materials to "teach" these patients about diabetes and would often demonstrate how Novo's products (like the FlexPen) can be easily used and would hand out "demo" or "trainer" FlexPens to patients to help familiarize them with Novo's products.  Further, Relator 1 states that she was not permitted to discuss any competing products – if she spoke about products with patients she was required to speak about Novo's products.  According to Relator 1, she has no doubt that it was the intent that these meetings would lead to "converting" these patients from their current diabetes medications and products to Novo's medications and products.  These meetings, when conducted, provided CDEs with points for both "teachable moments" and "device training" that counted towards that CDEs bonus.

147.    With respect to the second category, Relator 1 met with patients who had not yet been prescribed insulin (because they were resistant to the idea of going "on" insulin at their early disease stage) for the purported reason of "educating" them about diabetes generally.  In reality, however, these meetings were not merely about the patient's disease state.  Instead, these meetings were used to "push" insulin starts for these patients, and CDEs were instructed to apply the mantra of "insulin sooner, insulin earlier" to these meetings.  Again, as with the previous category of meetings, CDEs utilized Novo branded materials, and spent substantial amounts of time teaching patients how to use the Novo FlexPen and trumpeting its benefits and ease of use.  This is a critical point: if the true purpose of providing a CDE was to educate patients about diabetes and their

disease state, then there would have been reason for CDEs to teach those patients about or how to use a FlexPen because those patients were not yet taking any drugs for their condition. That is, educating patients about Novo's products, as well as their benefits and how to use them serves no purpose unless the goal is to induce those patients to utilize those products (to say nothing of the fact that CDEs should not have been using Novo branded materials, in any case). According to Relator 1, approximately 75% of patients she saw within this category went on Novo's insulin in one form or another. As with the prior category, these meetings, when conducted, provided CDEs with points for both "teachable moments" and "device training" that counted towards that CDEs bonus.

### c.   Defendants Carefully Tracked the CLWD Return on Investment

148.   The true motive and design of the CLWD program was solely about return on investment ("ROI"). Indeed, ROI was the end-all-be-all when it came to Novo's administration of the CLWD program. Novo (unlike Defendants) did not derive any direct income from the CLWD program. Rather, it relied upon CDEs to promote its products, therefore increasing its sales figures.

149.   The importance of the CLWD's ROI to Novo cannot be understated. Indeed, notes, reports and evaluations for PT's CDEs are riddled with references to ROI. For example, notes from CDE Kim Tobias' Field Ride Along from November 12, 2009, state the following:

> Sales Team Relationships. Strong working relationships with Novo. Speaks monthly with DBM's – discusses needs to penetrate key accounts. The more Kim is in leveraging TM's in accounts, the > ROI she is generating for NNI as 40-60% of her TM's are Flex Pen conversions.

### 5.   The Launch of Victoza

150.   In mid-to-late 2009, Relator 1 and her colleagues began hearing about a new Novo drug that was coming onto the marketplace, Victoza. Victoza is a GLP-1 drug. Victoza is not

insulin but rather works like the hormone GLP-1 to slow food leaving the stomach, helping prevent the liver from making too much sugar, and helping the pancreas produce more insulin when blood sugar levels are high.  GLP-1 drugs were becoming the preferred drug of choice for, at risk, but pre-diabetic patients.  By the time Relator 1 started hearing rumblings of Victoza entering the market, several of Novo's competitors had already launched their own GLP-1 drug.  Victoza, however, was unique in that it could be injected with a FlexPen and only needed to be administered once a day.  In corporate filings, Novo touted Victoza as its biggest potential revenue source.

151.    Victoza works by reducing A1C blood sugar levels in patients.  A1C is a blood test that looks at an individual's blood sugar over a two to three month window.   It serves as a benchmark metric in the fight against diabetes.  A patient's ability to lower their A1C levels dramatically improves patient outcomes.  By this time, Victoza had already been widely used in Europe, and Novo fully expected the FDA to approve the drug in late December 2009 or January 2010.

152.    Victoza received the FDA's approval, and, therefore, entered the marketplace, on January 26, 2010.  Victoza was sold in packs of two or three.  After the drug received its initial FDA-approval, patients taking the drug began experiencing weight loss. Thus, in December 2013, the FDA approved Victoza as a treatment option for weight management.

153.    Novo was aware of the economic opportunity that Victoza presented, and had been planning for Victoza's rollout in the United States for several years prior to receiving FDA approval.   Patricia Bradley ("Ms. Bradley"), Novo's Director of Diabetes Marketing, the same woman who invented Novo's "educational" program scheme, also directed the U.S. rollout of Victoza.  She worked very closely with PT's senior management, specifically John Beriont ("Mr. Beriont") and Ms. Freeburg.

154.     Novo's marketing plan was to continue to leverage the relationships PT's CDEs had already established with PCP targets, and aggressively promote Victoza to these providers. Due to the competition already in the marketplace, Novo wanted to gain GLP-1 market share as fast as possible.  This required coordination with Novo's independent marketing and sales agent – PT. Thus, as early as the 3rd Quarter of 2009, Novo invited PT personnel to national and regional sales meetings to brief them on Novo's marketing strategy for Victoza. Relator 1 attended these meetings.  Relator 1 specifically recalls attending a Novo POA (regional sales conference) where Victoza was extensively discussed.   Novo representatives trained PT's CDEs on the GLP-1 hormone, Victoza and its indications, and its benefits over competing products in the GLP-1 marketplace.

155.     For example, Relator 1 recalls a power point slide captioned "2010 Launch of Victoza" which stated that CDEs should speak to the "educational needs of staff and patients" and that "GLP-1 is synonymous with Victoza."  Moreover, the slide further stated that, to determine which physicians to call on, CDEs should "collaborate and coordinate with NNI sales representatives and DBM's to prioritize accounts to drive GLP-1 messaging."

156.     Defendants and Novo ensured that PT's CDEs were ready to promote Victoza from day one.  For example, the January 2010 (the month and year Victoza entered the U.S. marketplace) End of Month Report for CDE JW states the following:

> "Reviewed GLP-1 brochure with gold physician on day of FDA approval for Victoza. Physician stated, 'This is what we have been waiting for, once daily.'"

157.     Relator 1 notes with a high degree of certainty that a Victoza prescription followed that recommendation on the day of that encounter.

158.     To assist in their promotion of Victoza, Novo provided PT's CDEs with the following materials to provide to physician practices and their staff:

1) Novo injectable video showing how to inject Levemir and Victoza.

2) "Injectable Barriers DVD - Leave Behind."  This was a Novo produced video, which could be left behind in a physician's office so the physicians could use to teach their patients how to use Novo products.

3) Incretin Hormone DVD.  Again, this was a Novo produced DVD, which showed the medical benefits, pharmacology, and more technical information regarding Novo's products.

4) Victoza Pen Training Kits.  These were Novo branded materials with the brand name of "Victoza" printed on the injectable pen.

5) Victoza Starter Kit.  These were kits that included the pen and information regarding how to utilize the pen.

6) Unbranded Flash Card Presentation.

7) TOIGC - GLP-1 Discussion Materials.

8) CLWD Books - GLP-1 Topics.

159.    Throughout 2010, when Victoza was still relatively new to the U.S. marketplace, PT and Novo meticulously tracked PT CDEs' utilization of above mentioned Victoza/GLP-1 messaging materials.  For example, whenever a CDE provided a physician practice with a Victoza/GLP-1 session, information about his/her encounter was entered into the PETS system, which would make the CDE eligible for bonuses and other additional incentive compensation.  In addition, CDEs, in their monthly reports, touted "Success Stories," which were when they convinced a physician to start his or her patients on Victoza, or switch the patient from a competitor medication.

160.    Almost identical to the above-described practices involving Novo drugs NovoLog and Levemir, Relator 1 and her CDE colleagues were taught to detail, promote and recommend Victoza.  This, however, was the natural and intended consequence of Novo's actions.  After all, PT's CDEs were specially trained diabetes clinicians, who were, by the time Novo launched Victoza, the "go to" experts for the PCP targets' diabetes questions.  Novo gave the CDEs the task of promoting Victoza/GLP-1 as the most important medication intervention for any patient at risk

for diabetes.  And, at Novo's and Defendants' direction, PT's CDEs pushed this Victoza/GLP-1 message while armed with Novo branded materials, Victoza branded pens, and Victoza branded literature.  Thus, when PCP targets would inevitably inquire as to the availability of the best GLP-1 product on the market, PT's CDEs would always recommend Victoza and that a Novo sales representatives visit the practice to detail Victoza.  After this exchange, a Novo sales representative would then follow up to "close" the deal and "pull through" the sale.

161.    The success of the pull through strategy was extraordinary.  For example, in the United States, Victoza sales went from less than $1 million to greater than $270 million.  Indeed, this success was built on the recommendations of PT CDEs in violation of the AKS.

162.    Further, as with NovoLog and Levemir, Novo openly offered the value of the PT CDE's free services in order to drive Victoza prescriptions.  Specifically, during the Victoza launch, Novo sales representatives contacted all of their high potential prescribing physicians, and directly offered the services of its CDEs, educational services, patient training and the like for the drug.  To that end, Novo sales representatives would be equipped with their corresponding CDE's business cards, which they would provide in conjunction with offering the CDE's services to any physician who had diabetic patients and was considering starting them on Victoza.

163.    Even a cursory review of Victoza's sales statistics demonstrates that PT's CDE promotion was a wild success from the very beginning. For example, below are the sales statistics for Victoza in 2010:

1)  February $5.4 million;

2)  March $10.3 million;

3)  April $5.5 million;

4)  May $21.3 million;

5)  June $25.1 million;

6)  July $31.1 million;

7)  August $34 million;

8)  September $38 million;

9)  October $41 million;

10)  November $47 million; and

11)  December $51 million.

164.    This 2010 fiscal year total was approximately $309.7 million.  Approximately 60% of this revenue is derived from State and Federal health care programs.

165.    As already discussed above, there was an extraordinary level of day-to-day coordination and collaboration between Novo sales representative and Defendants' CDEs.  This practice continued with the promotion of Victoza.  Relator 1's records are replete with PT CDEs acting in concert with their Novo sales representative counterparts.  In fact, PT's CDEs were even evaluated on the degree of cooperation and collaboration they demonstrated with their Novo sales counterparts.  Moreover, PT CDEs were instructed, and did in fact, refer to Novo and its products as "our, we," or "us."

166.    Indeed, it is unreasonable to believe, when considering the message and materials provided to PT's CDEs, that Novo intended PT's CDEs role to be independent or educational.

167.    Novo also coordinated the routing plans for the CDEs and tracked the PETS notes from PT.  There was also significant coordination and information sharing between PT and Novo senior management.  Specifically, PT's senior managers, Mr. Beriont and Ms. Freeburg, would meet with their Novo counterparts on a weekly basis.  Novo would provide Mr. Beriont and Ms. Freeburg with status reports and the direction of the marketing scheme going forward.  Mr. Beriont and Ms. Freeburg would then provide that same information to Relator 1 and other PT regional managers during their weekly conference calls.  Mr. Beriont and Ms. Freeburg would note that "Novo is very pleased" with the results.  This is obvious, of course, based upon the sales figures listed above.

168.    As noted above, there are comprehensive EOM reports, Annual Appraisals, Field Reports, and dozens of other documents that unequivocally demonstrate Novo and PT's joint cross promotion of Novo's diabetic medications.

169.    For example, the document entitled "0110 South Region Month End Report.doc" provides insight into this conduct.  In this document, the change in the goals and objectives of PT and Novo is discussed.  Now, instead of tracking practice agreements, the primary focus and objective for PT's CDEs is "GLP-1 Messaging" which is synonymous with Victoza.  The report is replete with data regarding the success of this messaging strategy.  Specifically, in January 2010 there were 1,166 heath care providers who received Victoza messaging from a PT CDE. Moreover, there was a dramatic increase in coordination between PT's CDE team and Novo's District Business Managers and sales representatives.  The report details multiple success stories of market penetration, achieved through PT's CDEs.  As this document demonstrates, PT, at the direction of Novo, switched its emphasis from signing up new practices for the CLWD program to instead calling on the existing practices who had practice agreements for sole purposes of promoting and marketing Victoza.

### 6.    The Marketing Scheme Was Highly Successful

170.    That the scheme itself was successful cannot be denied.  Relator 1 was present in many, many meetings in which Mr. Beriont continually noted that his Novo counterparts were "thrilled" about Novo's return on investment.  Indeed, Relator 1 attended national and regional sales meetings with Novo representatives where PT's efforts were lauded.  In fact, PT's own website details the success of this program.  Although not naming Novo specifically, the "success story" on PT's website is the story of PT and Novo's collaboration and effort to market to recommend and sell Novo's diabetic products.

171.    First, PT details its business goal as:

"working for a top-tier pharma company," [*i.e.,* Novo], and that "with over 27,000 primary care practices, a national team of clinical educators were developed to help providers and support staff improve the management of patients with diabetes, throughout the program, the efforts of the clinical educators were conducted according to nationally recognized standards of care."

172.    Moreover, the website goes on to state that the "actual results" were as follows:

1.  The PT team exceeded goals by enrolling more than 26,000 physicians into a comprehensive education program.

2.  The PT team delivered over 200,000 educational sessions to physicians, staff members and patients.

3.  PT consistently averaged four to five educational sessions each day, which average 46 minutes per session.

4.  99.3% of returned physician surveys reported that PT clinical educators scored "excellent" or "good" ratings in delivery of services in clinical competency.  The clinical educator teams at PT worked with healthcare practitioners to impact prescribing behavior.  They also work with patients to educate and inspire them to optimize their healthcare outcomes.  In fact, the website further states as a heading, "Impacting Prescribing Behaviors through Education and Inspiration."

173.    Moreover, PT notes on its website that it can "enhance the sales representative's access to physicians and create a receptive audience for their message."  Without question, PT achieved its business objective.  But to do it, it violated the AKS.

### 7.    Novo Brings the CDE Program In-House

174.    In late 2010, the contract with Novo and Defendants was abruptly cancelled.  While the contract had apparently always been year-to-year, given PT's success in converting PCP targets to Novo's products, Relator 1 and her team fully expected that the contract would be renewed in 2011.  Instead, Relator 1 learned that Novo was now taking the entire marketing scheme "in house," that is, Novo would now directly employ the CDEs it was sending to physicians' offices to promote Novo's products.  Although the exact cost of bringing the CDEs in-house is unknown,

a former high-level Novo employee known to Relators estimates that, to hire four hundred CDEs, it would cost between $25 and $50 million, depending on the specifics of the program.

175.    The advantages to Novo in bringing the CDE program in-house are directly correlated to increasing sales for its diabetes medications.  Specifically, by bringing the program in-house, Novo gained greater controls of the type of education that the CDEs were providing, as well as the message conveyed to potential referral sources.  Thus, by bringing the program in-house, Novo, in addition to the financial advantages, was able to ensure that the CDEs had an even greater focus than previously on promoting the Covered Drugs.

176.    Bringing the CDEs in-house also allowed for greater collaboration between CDEs and Novo's sales force.  This is due to the fact that by directly employing the CDEs, Novo could ensure that CDEs and sales representatives had the same objectives and goals because the Company now had complete control over the CDEs.  Moreover, sales representatives were less reluctant to work with CDEs because they did not have to worry about a third-party representative calling on their customers.

177.    What Relator 1 did not know was that Novo had been planning for over a year to take the "education" scheme "in-house."

178.    Relator 2 states that in and around late 2008/early 2009, conversations took place inside Novo about bringing the diabetes education program "in-house."  At that time, Patricia Bradley, Novo's Director of Diabetes Marketing, led the effort to make this transition.  Relator 2 states that Ms. Bradley had detailed financial data showing the cost of the PT contract as well as the return on investment.  Although the precise contractual cost is not known, it is believed to have been in the millions of dollars.  According to Relator 2, Ms. Bradley believed that by bringing the diabetes education program in-house, Novo would save millions of dollars and achieve an even

greater return on investment.  In late 2008, Ms. Bradley began working on a proposal for Novo's executive team in order to "sell" this transition to Novo's executives.

179.    Eventually, most, if not all of PT's managers and CDEs, were offered the opportunity to interview for management and/or diabetes education positions. Novo interviewed all of Relator 1's team members, and subsequently hired approximately 80% of PT's CDEs.  Novo interviewed but did not retain Relator 1.  However, eight members of Relator 1's CDE team were hired and began working directly for Novo, calling on the same PCP targets they had been calling on and building relationships with while employed by PT.

> **a.    Novo's In-House Program Violated the AKS by Inducing PCPs by Providing Educational Resources and Product Support Systems**

180.    As already discussed, above, Novo (then acting through PT) provided PCPs substantial consideration for prescribing Novo products.  Once Novo brought the program in-house, however, and as discussed below, it began to provide these services directly to PCPs.

> *i.    Office Educational Sessions*

181.    "Office Educational Sessions" occurred when Novo had an established relationship with a PCP and a CDE would ostensibly provide independent diabetes education to the PCPs' staff regarding diabetes standards of care, best practices and other disease awareness education – all unbranded or unrelated to any Novo's products.  Novo's free education from a CDE, however, represented a "*valuable tangible benefit to the physician*" as it "*eliminate[d] an expense that the physician would have otherwise incurred (i.e., have independent value to the physician).*"  *OIG CPG Section II (2).* This education permitted PCP's providers to save time and money by outsourcing staff and patient training to a skilled CDE.  In many instances, PCPs would need to first train their staff on diabetes products and services, in particular, PCP practices would need to

train their medical assistants, nurses, physician's assistants and nurse practitioners how to perform insulin injections and/or utilize injection pens. If a PCP's staff needed to better understand and treat patients regarding diabetes awareness, diet, exercise, medications or anything related to the management of diabetes, Novo's diabetes educators would provide this free training. As stated above, CDEs can and do charge thousands of dollars to provide this education to PCPs

182. Relators state, without question, that Novo's sales representatives would offer this "free training" to PCPs as an inducement to write prescriptions for Novo's diabetes medications. Absent Novo's free training, a PCP office would otherwise need to spend its own time and resources training its staff in diabetes management. Similarly, after a PCP would agree to this training, Relators state that the CDEs make clear to PCPs' staff that the education would continue if the PCP "supported" Novo's products – that is, wrote the product – after all the CDEs were employed by Novo.

183. Further, Relators state that Novo's true purpose in providing office educational session was to permit its CDEs directly to promote Novo's products to PCPs and staff members. This promotion was conducted under the guise of "independent" education yet all of the education materials contained Novo's logo and branding. Further, these conversations frequently, if not always, included discussion about diabetes medications – and the CDEs would exclusively recommend Novo products.

*ii.    Patient Educational Sessions*

184. "Patient Education sessions" were direct "CDE to patient" education about diabetes in a PCP office; or occasionally off-site at a "diabetes academy." As with the staff training, these patient education sessions were ostensibly to provide a referring PCPs' patients with diabetes education which was completely and totally unrelated to any of Novo's products. And, as with

the staff training, this patient education had value to a PCP in terms of saving staff time and resources; and ultimately how it would be tied to A1C the reimbursement bonus for the PCPs under the PQRS.   Relators state that one of the main reasons for the patient education session was to allow for the CDE to directly market Novo's products to patients.

*iii.*        *Device Training Sessions*

185.    "Device Training Sessions" occurred where a CDE would train a patient how to use a Novo product.  The ostensible purpose of this CDE encounter was to teach patients who had already been prescribed and had filled a Novo product, how to use the Novo product – specifically how to use the Novo FlexPen.  Novo took device training further to maximize its ROI from CDEs. First, while some manufacturers choose to do device training in a patient's home after a prescription has been written, authorized and filled, Novo insisted this training be done in the PCPs' office to leverage the opportunity into more access and more sales.  Typically, an in-office "device training" – involves three people: a trained clinician from the pharmacy or prescriber who has expertise on the device; a patient who has already been prescribed a drug; and, a staff member from the PCPs office who is present during the training.  The patient is shown how to use the device, any questions regarding the device are answered and the patient "graduates" – that is, has demonstrated competency in the device.  This encounter should only have occurred for patients who had been prescribed and had received the Novo product.   Unlike the other encounters, these sessions could be branded if, and only if, the patient had the product.

186.    Novo's "device training," however, was not really used as training – it was used as a pretense to promote the FlexPen.  Indeed, instead of providing "device training" solely to those patients who had been prescribed and received the FlexPen, Novo's CDEs instead engaged in "device training" as part of their general education sessions.  This "device training," however,

violates the law in that it necessarily incorporates promotion of a branded product – Novo's FlexPen – in connection with a supposedly neutral "educational" session.

187.     As a result, according to Relator 2, Novo senior management made it absolutely clear to its CDEs that device training was an important metric for their bonuses, as it directly correlated to product sales by Novo.  Indeed, Relators state that Novo senior management had CDEs target PCPs whose IMS data showed that its patients had a high number of oral insulin prescription – which meant that the PCP was "over-utilizing" orals and thus "under-utilizing" the higher reimbursed injectable like the FlexPen.  Relators state that Novo recognized that CDEs could employ a particularly powerful influence strategy to drive patients off orals and to either start a Novo injectable or switch from a competitor's drugs to Novo.  That influence strategy was "fear" – or overcoming a patient's fear of starting an injectable.  CDEs are well-trained to overcome the well-known medical phenomenon of "needle phobia" or injection fear and/or a patient's fear of insulin in general. These fears are recognized by CDEs as the biggest obstacles in starting and ensuring that a patient remains on an injectable.  The CDEs' true goal in all of these patient education encounters was to show a patient the ease and the painlessness with which the Novo injection device could be used, overcome a patient's fears about the needle and ultimately convince and persuade that patient to start on a Novo product.

188.     Indeed, Relator 2 confirms that at most, if not all, patient encounters CDEs would promote and teach patients about Novo's drugs in general and the FlexPen specifically regardless of whether the patient had already chosen to use the Novo product.  The goal was to persuade patients who had been using orals or a competitor's product to "convert" to a Novo injectable. (Of note, this conversion would result in a "device training" and "teachable moment," which were part of the CDEs' bonus compensation metrics).  Thus, Novo's patient education program became part

of a powerful influence strategy to convert patients – who had not yet decided to use a Novo injectable – to use a Novo product.  CDEs deployed device training and educational session as an additional direct to patient/consumer marketing tool to influence a patient to start insulin, Victoza and/or switch from a competitor's products. Novo's scheme had great results. Frequently, according to Relators, during the session the patient would agree to immediately start on a Novo product.  As such, a Novo drug prescription was immediately written by an office staff member with whom the CDE had developed a relationship for the Novo drug.

189.    Still other times, the patient was actually started on a sample of the Novo drug – before the first prescription had been authorized and filled by the patients' prescription payer.  Of course, the Novo CDE would work with that patient to teach them how to use the Novo device sample.  Relators state that this influence strategy was a tremendous success – after most patient education sessions, there was an almost 100% conversion of patients from oral medications to higher reimbursed Novo injectables or from competitor's products to Novo's products.  Again, Novo's strategy was very successful: according to Relator 2, in 2012, alone, Novo's CDEs provided close to 10,000 device training to patients in the New York Metropolitan area and that a high percentage were successfully converted to a Novo product by CDEs.

190.    It should be noted that PCPs and/or their office staff were substantially incentivized to allow Novo's scheme to happen because it resulted in higher reimbursements from A1C reductions, office visit reimbursement for patients who came to the office for diabetes education and/or training and savings of office staff time and resources.  Thus, it is unsurprising that part of the "pitch" to PCPs to use CDEs involved showing a correlation between lowering patient A1Cs and Medicare reimbursements.  Indeed, CDEs would offer to manage the PCPs least compliant or "worst" patients – (*i.e.*, patients with the highest A1Cs), which meant that this pitch was

particularly effective as the worst patients' high A1Cs numbers would pull down the PCPs average A1Cs and adversely affect reimbursements.

191.    Further, Novo could also induce PCPs to write Novo products by performing the "patient education" in the PCPs office because once the patient came to the office, the PCP could bill for an office visit – even if the PCP did nothing more than a "drive by" office visit and most of the encounter was spent between the CDE and the patient or patients.  Moreover, although ostensibly the patient and CDE education encounter should have occurred with the PCP or a staff member present, CDE soon began to work independent of the PCPs staff – after all, the CDE is a trained clinician who has managed patients in the past.  Thus, Relators state that it was commonplace for Novo deployed CDEs to effectively manage a PCP's diabetes patients without any staff member being present – freeing the PCP and/or staff to work in other areas.

192.    Relator 2 states that a Bronx, New York endocrinologist, Dr. Charmain Cohen (who was a high-volume writer of Novo's products), represents a good example of how the scheme played out.  According to Relator 2, Dr. Cohen regularly scheduled a Novo CDE to come to the office and "educate" the practice's diabetes patients.  Maria Alonzo, one of Novo's CDEs, would spend at least one day a week at Dr. Cohen's office.   Each time Ms. Alonzo would visit Dr. Cohen's office, she would actively manage Dr. Cohen's diabetes patients for Dr. Cohen.  Dr. Cohen would then bill for the office visits and the patients would all eventually be prescribed a Novo product.  Relator 2 states that most of the CDEs in his NY Metro territory had similar "go to" doctors who would each agree to give Novo's CDEs access to diabetic patients.  Again, and as already mentioned above, according to Relator 2, Ms. Bradley made it absolutely clear to CDEs that all device training must involve a Novo product, that they were not allowed to train patients on any other device, and that they were required to collaborate with Novo sales representatives.

193.    Relator 2's documents demonstrate this close, constant, and effective collaboration.

Some examples are as follows:

1.  30-60 Day Report Wendy Martinez

Win-Win COLLABORATION WITH SALES TEAM
Collaborated across boundaries with EDCS and DCS to share info of shared targets.

Identified key target offices/ valued customers to provide best services to impact,
influence and engage customers to achieve strategic planning to establish success.
Shared calendars with EDCS and DCS to develop collaborative partnership thru
MD lunches.

Conducted frequent collaboration meetings with EDCS and DCS to discuss
strategy, plan, and discuss goals, successes and challenges.

2.  60-day report of Natalia Botero, RD, CDN

Win: Win Collaboration with Sales team

Consistent contact with DCS and EDCS teams.

Assistance provided in obtaining remaining PAs w/DCS colleagues.

Collaborative lunches with DCS teams when in area.

3.  DEP Team Monthly Conference Call

Continue to communicate and collaborate with [SALES REPS] teams by Sharing
my outlook calendar.

Sending out email updates to sales team of my DE success and challenges and
office quotes.

Attend JDRF Type 1 Educational seminar with EDCS sales team mate and EDCS
Mgr. Dorothy.

Continue to work with sales team to assess how to capitalize on the potential
opportunities when Levemir becomes top formulary choice at local hospitals and
LTC facilities.

### b.    Novo Directly Aligns CDE's Function Metrics with Sales Volume

194.    After taking over the "education" program from PT, Novo hired and deployed

hundreds of additional diabetes educators to carry out its scheme. And Ms. Bradley designed Novo's "new" CDE incentive plan to incentivize sales. Although this incentive plan and the metrics continued to change and evolve during Relator 2's tenure as the NY Metro region manager, he states that the metrics were always about one thing and one thing only – driving Novo prescription sales.

195.    According to Relator 2, CDE employee performance metrics were as follows:

1) C4C marketing plans (15%)

2) Gold penetration (30%)

3) Total sessions - Deliver sessions to HCP's to promote and execute the DEB (15%)

4) Total device training attendees - trained staff and patients prescribed Novo devices on how to use the device (10%)

5) Budget (5%)

6) HCP's Satisfaction Survey (5%)

7) Competencies including collaboration across boundaries. Identify leverage and build key relationships, impact, influences and engages customers, (20%).

196.    Relator 2 states that Ms. Bradley, the CDE managers and the CDEs knew it was unlawful for CDE clinicians to directly promote Novo's products. As such, those CDE performance metrics linked to sales were given benign names to conceal how they were correlated to Novo prescription revenue.

197.    For example, "Gold Penetration," the name for a metric number 1 above, which made up 30% of the CDEs performance evaluations, was synonymous with calling on a potential high Novo diabetes product prescribers, in coordination with a sales representative, to drive Novo prescription volume and market share. To this end, CDE's and their Novo sales colleagues would constantly share and analyze Novo's IMS data to identify providers who could write more Novo

product and/or could be converted from an oral agent to a Novo injectable agent such as Victoza. As stated above, Novo called this conduct "conversions" or "switches."  Relator 2 states that he and all CDE's were trained to target providers whom data showed were "over-utilizing" lower reimbursed oral agents as this meant that those providers were "underutilizing" higher reimbursed injectables. Of note, the Relators are unaware of any justifiable genuine educational reason to target these providers.  That is, providers who were treating patients with cheaper oral medications had no greater need for education than any other provider.  Similarly, providers who were writing competitors' products had no greater need for education – unless of course, the education was carefully designed to convert or switch that provider to Novo products. However, Ms. Bradley and senior management labeled these providers as "Gold" because Novo's internal ROI analysis (gained through working with PT and its own in-house CDE teams) demonstrated a direct correlation and causative link between a CDE's gaining access to a provider and Novo's subsequent prescription volume.  As such, in designing the CDE's incentive metrics, Ms. Bradley gave the highest weight to "Gold Penetration" as that activity drove the highest ROI for Novo.

198.    CDE performance metric number 7 "Competencies including collaboration across boundaries…" is another clear example of Ms. Bradley aligning the CDE's performance metrics with sales representatives under an innocuous name.  For this metric, CDE's were trained that "collaboration" with sales was the key to driving Novo prescriptions.  In fact, an internal Novo training document entitled "DEP NY Metro Routing Presentation (Phase 1 Training).ppt" in the note section of Slide No. 13, states:

> during your collaboration meeting with your sales colleagues, identify top ten targets where there is access.  Access defined as (1) Mental Access:  Ability to talk to the MD; (2) Physical Access:  Office space is conducive to conduct PDT's and PM's; and (3) **MC Access:  Patient in that office is [are] covered on a plan where our products are covered**.

199.    The bolded sentence above refers to "products" – as Relator 2 points out, this term

can only, and does in fact, refer to NovoLog, Levemir, and/or Victoza – as the diabetes education

was free and thus could not be covered by any insurance, let alone "MC" or Medicare.  As Relator

2 points out, the *CDE program was to generally promote diabetes awareness, then all providers,*

*not just those who could write Novo products should have been targeted*.  However, if a PCP's

patients were part of an insurance plan which did not cover Novo products, Novo's CDE's would

not target those providers because those providers could not drive prescription volume.  Further,

this metric included "Identify leverage and build key relationships, impact, influences and engages

customers."  "Identify leverage" meant identify a means to get sales from the CDE program.

"[B]uild key relationships" meant relationships that could lead to access and thus sales.  "[I]npact,

influences and engages customers" means influencing prescribers. It was in this way that Ms.

Bradly designed this metric to incentivize CDE's to penetrate PCPs for purposes of prescriptions

sales, not providing educational services. This metric made up 20% of Novo's CDE's performance

evaluations

200.    Metric Number 4 "Total device training attendees - trained staff and patients

prescribed Novo devices on how to use the device (10%)" were also aligned with prescription

volume.  This metric was directly tied to a CDE being in the PCP office purportedly to train patient

on Novo devices and made up 10% of a CDEs' performance evaluations.

201.    Metric Number 3 "Total sessions - Deliver sessions to HCP's to promote and

execute the DEB-(15%)" was also designed to increase access and thus sales.  Relator 2 states that

this metric was directly tied to a CDE being in the PCP office purportedly to train the staff about

diabetes disease state awareness.  The training was the purportedly to be on the non-branded, non-

product related "CLWD" program – the very same program that Relator number 1 was promoting

as far back as 2009.   The foregoing incentives were very successful at driving CDEs and, derivatively, Novo's sales volume.

202.    Relator 2 also states that each one of his ten CDEs in the NY Metro had "Top Ten" targets provided by Novo.      In fact, a Novo training document entitled "DEP NY Metro Routing Presentation (Phase 1 Training).ppt" - Slide No. 13 states:

"Patient Device Training"

"Your top ten targets are aligned with all metrics, especially device training."

203.    That Novo senior management knew that this program was illegal is beyond reasonable dispute.   According to Relator 2, Novo senior management recognized the potential kickback compliance issue that its CDE program presented.    As such, Novo management instructed diabetes educators and sales representatives to be careful how this relationship was described.   As part of the training, CDEs were specifically give five "Don't," as follows:

"Don't correlate RX data to [C]DE initiatives."

"Don't email HCP target data/RX data."

"Don't link [C]DE activities to formulary wins."

"Don't offer [C]DE as an option for switches."

"Don't have sales attend patient interactions, teachable
moments and patient device training."

204.    Relator 2 states that this slide demonstrates the difference between Novo's "words" and its "actions."  That is, he states that the words:  "Don't correlate RX Data to [C]DE initiative" show that Novo diabetes educators were freely given the RX IMS sales data.  This, of course, allowed them to do exactly what they were supposedly not to do: correlate sales with CDE initiatives.  If the Company were sincere in this direction, it would have not simply given the CDEs this data in the first place.  And the third point – "Don't link [C]DE activities to formulary wins"

– establishes that Novo perceived (correctly) that there was a link between the CDEs' activities and formulary "wins." Finally, Relator 2 states that the last two admonitions were simply ignored as a matter of course.

205.    Similarly, in another document, Novo management states:

Rules of engagement:

… We have an open and honest communication with everyone in the team.
We do not discuss products with our sales colleagues on email.

206.    Again, this demonstrates that Novo was well aware of the impropriety of its actions – it specifically directed sales representatives and CDEs to collaborate and have "open and honest communication" – but just not over email.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

207.    Relators repeat each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

208.    As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TRICARE by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

209.    By virtue of the acts described above, Defendants have violated:

(1)    31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or

property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

210.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2) and (a)(7) prior to amendment, by engaging in the above-described conduct.

211.    By reason of the foregoing, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(1)     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., provides;

(2)     that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(3)     that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

(4)     that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(5)     that this Court order such other and further relief as it deems proper.

## COUNT II
**(California False Claims Act, Cal. Gov't Code § 12650 *et seq*.)**

212.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

213.     This is a *qui tam* action brought by Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

214.     Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)      knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2)      knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3)      conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4)      is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

215.     Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government funded health care programs.

216.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

217.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid

and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes and regulations was also a condition of payment of claims submitted to the State of California.

218.    Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

219.    As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

220.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

221.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT III</u>
### (Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)

222.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

223.    This is a *qui tam* action brought by Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

224.    Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*, provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the

"Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ...

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

225.    Defendants violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

226.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

227.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes and regulations was also a condition of payment of claims submitted to the State of Colorado.

228.    Had the State of Colorado known that Defendants were violating the federal and

state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

229.    As a result of Defendants' violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

230.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of themselves and the State of Colorado.

231.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IV
**(Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*)**

232.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

233.     This is a *qui tam* action brought by Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

234.     Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and intending to defraud the state or willfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying

receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or

(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

235.    Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

236.    The State of Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

237.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes and regulations was also a condition of payment of claims submitted to the State of Connecticut.

238.    Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

239.     As a result of Defendants' violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Connecticut False Claims Act on behalf of themselves and the State of Connecticut.

241.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

(1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT V</u>
**(Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)**

242.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

243.    This is a *qui tam* action brought by Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

244.    6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or

(d) Conspires to commit one or more of the violations in this subsection (1).

245.    Defendants violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

246.     The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

247.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes and regulations was also a condition of payment of claims submitted to the State of Delaware.

248.     Had the State of Delaware known that Defendants was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

249.     As a result of Defendants' violations of the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

250.     Relators are private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of itself and the State of Delaware.

251.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

    (1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### COUNT VI
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

252.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

253.    This is a *qui tam* action brought by Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

254.    Fla. Stat. § 68.082(2) provides liability for any person who:

    (a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

255.    Defendants violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

256.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

257.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes and regulations was also a condition of payment of claims submitted to the State of Florida.

258.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

259.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

260.    Relators are private persons with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on

behalf of themselves and the State of Florida.

261.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as
a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim
which Defendants caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other
applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with
this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VII
### (Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq*.)

262.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

263.    This is a *qui tam* action brought by Relators on behalf of the State of Georgia to

recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code

Ann., § 49-4-168 *et seq.*

264.    The Georgia False Medicaid Claims Act imposes liability on any person who:

(1)   Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)   Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4)   Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate of receipt;

(5)   Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6)   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program who lawfully may not sell or pledge the property; or

(7)   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia . . . .

265.    Defendants violated the Georgia False Medicaid Claims Act and knowingly caused

false claims to be made, used and presented to the State of Georgia by its deliberate and systematic

violation of federal and state laws and by virtue of the fact that none of the claims submitted in

connection with its conduct were even eligible for reimbursement by the Government-funded

healthcare programs.

266.     The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

267.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes and regulations was also a condition of payment of claims submitted to the State of Georgia.

268.     Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

269.     As a result of Defendants' violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

270.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

271.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF GEORGIA:

    (1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## <u>COUNT VIII</u>
### (Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)

272.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

273.    This is a *qui tam* action brought by Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

274.    Section 661-21(a) provides liability for any person who-

    (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; or

(4) Conspires to commit any of the conduct described in this subsection,

275.    Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

276.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

277.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes and regulations was also a condition of payment of claims submitted to the State of Hawaii.

278.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

279.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

280.    Relators are private persons with direct and independent knowledge of the

94

allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-21

on behalf of themselves and the State of Hawaii.

281.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF HAWAII:

(1) Three times the amount of actual damages which the State of Hawaii has
sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false
claim which Defendants caused to be presented to the State of Hawaii;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or
any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection
with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IX
### (Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)

282.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

283.    This is a *qui tam* action brought by Relators on behalf of the State of Illinois to

recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq*.

284.     740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

285.     Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

286.     The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

287.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes and regulations was also a condition of payment of claims submitted to the State of Illinois.

288.     Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to

meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

289.     As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

290.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

291.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants

To the STATE OF ILLINOIS:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT X
**(Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)**

292.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

293.    This is a *qui tam* action brought by Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq.*, which imposes liability on:

(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6) ....

294.    Defendants violated Indiana False Claims Act and knowingly caused false claims

to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

295.    The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

296.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes and regulations was also a condition of payment of claims submitted to the State of Indiana.

297.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

298.    As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

299.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

300.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF INDIANA:

(1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
### (Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)

301.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

302.    This is a *qui tam* action brought by Relators on behalf of the State of Iowa to recover

treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*

303.    Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for

any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(c) Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

304.  Defendants violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq*. and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

305.  The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

306.  Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with applicable Iowa statutes and regulations was also a condition of payment of claims submitted to the State of Iowa.

307.  Had the State of Iowa known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

308.  As a result of Defendants' violations of the Iowa False Claims Law, I.C.A. § 685.1

*et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

309.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of themselves and the State of Iowa.

310.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Iowa;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XII
**(Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*)**

311.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

312.    This is a *qui tam* action brought by Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

313.    La. Rev. Stat. Ann. § 438.3 provides-

  (A)  No person shall knowingly present or cause to be presented a false or fraudulent claim;

  (B)  No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

  (C)  No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

314.    Defendants violated La. Rev. Stat. Ann. §438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

315.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

316.    Compliance with the Anti-Kickback Statute applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct.  Compliance with applicable

Louisiana statutes and regulations was also a condition of payment of claims submitted to the State of Louisiana.

317.    Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

318.    As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

319.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of itself and the State of Louisiana.

320.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1)    Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XIII
### (Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*)

321.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

322.    This is a *qui tam* action brought by Relators on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*

323.    Section 2-602 of Maryland's False Claims Act imposes liability as follows:

(a) A person may not:

    (1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

    (2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

    (3) Conspire to commit a violation under this subtitle;

    (4) Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

    (5) (i) Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii)

Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

(6)   Knowingly buy or receive as a pledge of an obligation or debt publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

324.   Defendants violated the Maryland False Claims Act, and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

325.   The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

326.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct.  Compliance with applicable Maryland statutes and regulations was also a condition of payment of claims submitted to the State of Maryland.

327.    Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

328.    As a result of Defendants' violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

329.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of itself and the State of Maryland.

330.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF MARYLAND:

(1)    Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**COUNT XIV**

**(Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)**

331.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

332.    This is a *qui tam* action brought by Relators on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*, which provides in pertinent part as follows:

> Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;

> (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit ....

333.    Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

334.    The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

335.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid

and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with applicable Michigan statutes and regulations was also a condition of payment of claims submitted to the State of Michigan.

336.    Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

337.    As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

338.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Medicaid False Claims Act on behalf of themselves and the State of Michigan.

339.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false

claim which Defendants caused to be presented to the State of Michigan;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XV
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

340. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

341. This is a *qui tam* action brought by Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

342. Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2) knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3) knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain

payment or approval of a false or fraudulent claim;

(4) has possession, custody, or control of public property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered to the state or a political subdivision less money or property than the amount for which the person receives a receipt;

(5) is authorized to prepare or deliver a receipt for money or property used, or to be used, by the state or a political subdivision and knowingly prepares or delivers a receipt that falsely represents the money or property;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

343.    Defendants violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

344.    The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

345.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes and regulations was also a condition of payment of claims submitted to the State of Minnesota.

346.     Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

347.     As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

348.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the State of Minnesota.

349.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MINNESOTA:

(1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

<u>COUNT XVI</u>
**(Montana False Claims Act, MCA § 17-8-401 *et seq.*)**

350.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

351.     This is a *qui tam* action brought by Relators on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

352.     Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

(a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;

(c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;

(d) has possession, custody, or control of public property or money used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, delivers or causes to be delivered less property or money than the amount for which the person receives a certificate or receipt;

(e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the

property, makes or delivers a receipt without knowing that the information on the receipt is true;

(f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

(g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

353.    Defendants violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

354.    The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

355.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes and regulations was also a condition of payment of claims submitted to the State of Montana.

356.    Had the State of Montana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct

failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

357.   As a result of Defendants' violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

358.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Montana False Claims Act on behalf of themselves and the State of Montana.

359.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MONTANA:

(1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XVII
### (Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)

360.     Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

361.     This is a *qui tam* action brought by Relators on behalf of the State of Nevada to

recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat.

Ann. § 357.010 *et seq.*

362.     N.R.S. § 357.040(1) provides liability for any person who -

(a) knowingly presents or causes to be presented a false claim for payment
   or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record
   or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

(h) is a beneficiary of an inadvertent submission of a false claim and, after
   discovering the falsity of the claim, fails to disclose the falsity to the
   state or political subdivision within a reasonable time.

363.     Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made,

used and presented to the State of Nevada by its deliberate and systematic violation of federal and

state laws and by virtue of the fact that none of the claims submitted in connection with its conduct

were even eligible for reimbursement by the Government-funded healthcare programs.

364.     The State of Nevada, by and through the Nevada Medicaid program and other state

healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare

providers and third party payers in connection therewith.

365.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid

and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes and regulations was also a condition of payment of claims submitted to the State of Nevada.

366.    Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

367.    As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

368.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

369.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request that this Court award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XVIII</u>
### (New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*)

370. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

371. This is a *qui tam* action brought by Relators on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*, which provides that:

I.     Any person shall be liable who...

(a) knowingly presents, or causes to be presented, to an officer or employee of the State, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

372. Defendants violated N.H. Rev. Stat. Ann. §167:61-b *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-

funded healthcare programs.

373.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

374.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Hampshire in connection with Defendants' conduct. Compliance with applicable New Hampshire statutes and regulations was also a condition of payment of claims submitted to the State of New Hampshire.

375.    Had the State of New Hampshire known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

376.    As a result of Defendants' violations of N.H. Rev. Stat. Ann. §167:61-b *et seq.*, the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

377.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-b *et seq.* on behalf of themselves and the State of New Hampshire.

378.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW HAMPSHIRE:

(1) Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Hampshire;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XIX
### (New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)

379.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

380.     This is a *qui tam* action brought by Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

381.     N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

382.    Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

383.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

384.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with

applicable New Jersey statutes and regulations was also a condition of payment of claims submitted to the State of New Jersey.

385.    Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

386.    As a result of Defendants' violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

387.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New Jersey False Claims Act on behalf of themselves and the State of New Jersey.

388.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XX
### (New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)

389. Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

390. This is a *qui tam* action brought by Relators on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part as follows:

A person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;

(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim . . . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

391. Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New

Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

392.   The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

393.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes and regulations was also a condition of payment of claims submitted to the State of New Mexico.

394.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

395.   As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

396.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of themselves and the State of New Mexico.

397.   This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

    (1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XXI
### (New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)

398.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

399.    This is a *qui tam* action brought by Relators on behalf of the State of New York to

recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State

Fin. Law § 188 *et seq.*, which imposes liability on any person who:

    (a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for

payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government; or

(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

400.     Defendants violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

401.     The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

402.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with applicable New York statutes and regulations was also a condition of payment of claims submitted to the State of New York.

403.     Had the State of New York known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

404.     As a result of Defendants' violations of the New York State False Claims Act, the

State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

405.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New York State False Claims Act, on behalf of themselves and the State of New York.

406.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW YORK:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXII
### (North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)

407.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

408.    This is a *qui tam* action brought by Relators on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*

409.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607, provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section;

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

410.    Defendants violated the North Carolina False Claims Act, and knowingly caused

false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

411.    The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

412.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct.  Compliance with applicable North Carolina statutes and regulations was also a condition of payment of claims submitted to the State of North Carolina.

413.    Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

414.    As a result of Defendants' violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

415.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of itself and the State of North Carolina.

416.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIII
### (Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)

417.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

418.    This is a *qui tam* action brought by Relators on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63

Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

419.    Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

3.    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

4.    Has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

5.    Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

6.    Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, who lawfully may not sell or pledge the property; or

7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

420.    Defendants violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

421.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

422.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct.  Compliance with applicable Oklahoma statutes and regulations was also a condition of payment of claims submitted to the State of Oklahoma.

423.    Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

424.    As a result of Defendants' violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

425.    Relators are private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of itself and the State of Oklahoma.

426.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

(1)     Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## <u>COUNT XXIV</u>
**(Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)**

427.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

428.    This is a *qui tam* action brought by Relators on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

429.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or

statement to get a false or fraudulent claim paid or approved by the state;

(3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the state or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

430.     Defendants violated the Rhode Island False Claims Act and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

431.     The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

432.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct.  Compliance with applicable Rhode Island statutes and regulations was also a condition of payment of claims

submitted to the State of Rhode Island.

433.    Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

434.    As a result of Defendants' violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

435.    Relators are private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of itself and the State of Rhode Island.

436.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

(1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXV
### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

437.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

438.    This is a *qui tam* action brought by Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

439.    Section 71-5-182(a)(1) provides liability for any person who:

    **a.**  presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

    **b.**  makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

    **c.**  conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

440.    Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

441.    The State of Tennessee, by and through the Tennessee Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

442.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes and regulations was also a condition of payment of claims submitted to the State of Tennessee.

443.    Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

444.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

445.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

446.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

    (5) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' conduct;

    (6) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

    (7) Prejudgment interest; and

    (8) All costs incurred in bringing this action.

To Relators:

    (5) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

    (6) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (7) An award of reasonable attorneys' fees and costs; and

    (8) Such further relief as this Court deems equitable and just.

## COUNT XXVI
### (Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)

447.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

448.    This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

449.    V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or
    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program

(2) knowingly or intentionally concealing or failing to disclose an event:

(a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

(i) the person, or

(ii) another person on whose behalf the person has applied        for   a benefit or payment or is receiving a benefit or payment; and

(b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

* * *

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

* * *

(b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

450.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

451.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

452.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes and regulations was also a condition of payment of claims submitted to

the State of Texas.

453.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

454.    As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

455.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

456.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

457.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## <u>COUNT XXVII</u>
**(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

458.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

459.     This is a *qui tam* action brought by Relators on behalf of the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

460.     Vt. Stat. Ann. tit. 32, § 631 in pertinent part provides for liability for any person who:

(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

(3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;

(4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;

(5) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;

(6) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or

(7) conspire to commit a violation of this subsection.

461.   Defendants violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

462.   The State of Vermont, by and through the Vermont Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

463.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Vermont in connection with Defendants' conduct. Compliance with applicable Vermont statutes and regulations was also a condition of payment of claims submitted to the State of Vermont.

464.     Had the State of Vermont known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

465.     As a result of Defendants' violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

466.     Relators are private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of itself and the State of Vermont.

467.     This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF VERMONT:

(1)     Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

(3)     Prejudgment interest; and

(4)     All costs incurred in investigating and bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

<u>COUNT XXVIII</u>
**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*.)**

468.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

469.     This is a *qui tam* action brought by Relators on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*

470.     RCWA 74.66.020 in pertinent part provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit one or more of the violations in this subsection (1).

471.     Defendants violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

472.     The State of Washington, by and through the Washington Medicaid program and

other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

473.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Washington in connection with Defendants' conduct. Compliance with applicable Washington statutes and regulations was also a condition of payment of claims submitted to the State of Washington.

474.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

475.    As a result of Defendants' violations of the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

476.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq*. on behalf of itself and the State of Washington.

477.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

    (1)    Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### COUNT XXIX
**(Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*)**

478.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

479.    This is a *qui tam* action brought by Relators on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*

480.    The Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.* provides for liability for any person who:

    (a) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

    (b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

    (c) Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

*   *   *

Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.

    (g) Is a beneficiary of the submission of a false claim for medical assistance to any officer, employee, or agent of this state, knows that the claim is false, and fails to disclose the false claim to this state within a reasonable time after the person becomes aware that the claim is false.

481.    Defendants violated the Wisconsin False Claims Act and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

482.    The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

483.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' conduct. Compliance with applicable Wisconsin statutes and regulations was also a condition of payment of claims submitted to the State of Wisconsin.

484.     Had the State of Wisconsin known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

485.     As a result of Defendants' violations of the Wisconsin False Claims Act, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

486.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Wisconsin False Claims Act on behalf of themselves and the State of Wisconsin.

487.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WISCONSIN:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Wisconsin False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXX
**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)**

488.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

489.     This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

490.     Mass. Gen. Laws Ann. Ch. 12 § 5B provides liability for any person who-

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth; or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

\*   \*   \*

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

491.     Defendants violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its

conduct were even eligible for reimbursement by the Government-funded healthcare programs.

492.    The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

493.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes and regulations was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

494.    Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

495.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

496.    Relators are private persons with direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

497.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXI
**(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)**

498.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

499.    This is a *qui tam* action brought by Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, which provides liability for any person who-

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

* * *

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

500.    Defendants violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

501.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

502.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct.  Compliance with applicable Virginia statutes and regulations was also a condition of payment of claims submitted to the Commonwealth of Virginia.

503.    Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs

or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

504.   As a result of Defendants' violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

505.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of itself and the Commonwealth of Virginia.

506.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1)   Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relators:

(1)   The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

### COUNT XXXII
**(District of Columbia Procurement Reform Amendment Act,**
**D.C. Code Ann. § 2-308.13 *et seq.*)**

507.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

508.    This is a *qui tam* action brought by Relators and the District of Columbia to recover

treble damages and civil penalties under the District of Columbia Procurement Reform

Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

509.    D.C. Code § 2-308.14(a) provides liability for any person who-

(1)  knowingly presents, or causes to be presented, to an officer or employee
of the District, a false claim for payment or approval;

(2)  knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false claim paid or approved by the District;

(3)  conspires to defraud the District by getting a false claim allowed or paid
by the District;

\* \* \*

is the beneficiary of an inadvertent submission of a false claim to the
District, subsequently discovers the falsity of the claim, and fails to disclose
the false claim to the District.

510.    Defendants violated D.C. Code § 2-308.14(a) and knowingly caused false claims

to be made, used and presented to the District of Columbia by its deliberate and systematic

violation of federal and state laws and by virtue of the fact that none of the claims submitted in

connection with its illegal conduct were even eligible for reimbursement by the Government-

funded healthcare programs.

511.    The District of Columbia, by and through the District of Columbia Medicaid

program and other District healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

512.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance with applicable District of Columbia statutes and regulations was also a condition of payment of claims submitted to the District of Columbia.

513.    Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

514.    As a result of Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

515.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

516.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

517. Relators demand a jury trial.

DATED: January 5, 2018                    Respectfully submitted,

**SIMMER LAW GROUP, PLLC**

By: _____
W. SCOTT SIMMER
DC BAR #460726
ANDREW M. MILLER
DC BAR #499298
THE WATERGATE, SUITE 10-A
600 NEW HAMPSHIRE AVENUE, NW
WASHINGTON, DC 20037
PHONE: 202-333-4562
FAX: 202-337-1039

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
JAMES M. FICARO
ROSS M. WOLFE

156

22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

*Attorneys for Relators*